THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JONATHAN BOTEY | : |
| Plaintiff, | : |
| v. | :    3:12-CV-01520 |
| | :    (JUDGE MARIANI) |
| ROBERT GREEN, et al., | : |
| Defendants. | : |

## MEMORANDUM OPINION

Presently before the Court is a Report and Recommendation ("R&R") (Doc. 125) by Magistrate Judge Carlson, in which he recommends denying Defendants' Motion for Partial Summary Judgment (Doc. 103) in the above-captioned action. Defendants have filed Objections to which Plaintiff has responded. (*See* Defs.' Objections, Docs. 126, 127; Pl.'s Opp. to Defs.' Objections, Doc. 128; *see also*, Defs.' Reply, Doc. 129). For the reasons that follow, upon *de novo* review of the R&R, the Court will adopt the pending R&R.

On August 6, 2012, this action was removed from the Court of Common Pleas of Lackawanna County. Plaintiff Jonathan Botey's Amended Complaint alleges Negligence against Robert Green, Conwell Corporation, and FFE Transportation Services, Inc. (Counts I, II, III), as well requesting punitive damages against each of the Defendants (Counts IV, V, VI). (Doc. 1).

On September 9, 2015, Defendants filed a Motion for Partial Summary Judgment requesting that the Court dismiss the punitive damage claims against Green, FFE, and

Conwell as well as Plaintiff's claims for negligent qualification, hiring, supervision, monitoring, training and entrustment against FFE and Conwell contained in Counts II and III. (Doc. 103).

Defendants object to the Magistrate Judge's findings on several grounds and request that this Court reverse the Magistrate Judge's recommended denial of Defendants' motion or, in the alternative, reverse the Magistrate Judge's recommended denial of Defendant Green and Conwell's motion for partial summary judgment. (Doc. 126, ¶ 8). Specifically, Defendants argue that (1) Plaintiff failed to meet the heavy burden set forth to defeat a motion for summary judgment with respect to punitive damages and that FFE's training records are insufficient to create an issue of fact and to defeat a motion for summary judgment; and (2) that the Magistrate Judge erred by "impliedly" finding that FFE's training records apply to each of the three defendants. (*See generally*, Docs. 127, 129).

Defendants argue that "Plaintiff's evidence carries the implication that *any* negative commentary, or violation, during *driver training* may: 1) later raise a genuine issue of fact; 2) permit an inference against a trucking company that it had a subjective awareness of the dangers posed by its drivers; and 3) later subject it to a punitive damages claim. Plaintiff essentially argues that trucking companies must have perfect drivers at all times, even during training, to prevent a claim for punitive damages." (Doc. 127, at 11) (italics in original). While the Court declines to comment on Defendants' interpretation of Plaintiff's argument, it disagrees with Defendants' ultimate conclusion. This is not a case where

Plaintiff has merely pointed to one or two violations. Rather, as the R&R makes clear, FFE's training records indicate that:

> [O]n December 30, 2010, the driving instructor noted 40 deficiencies in Green's performance; on January 7, 2011, 42 deficiencies were noted; on January 13, 2011, 32 deficiencies were observed; on January 21, 2011, 42 deficiencies were noted; and on January 28, 2011, 7 deficiencies– including a citation for running a stop sign– were documented in these training records. (Doc. 108-11, 108-13.) The nature of these deficiencies is also troubling. These the [sic] training records: (1) documented an episode in which Green ran a stop sign and received a citation; and (2) also repeatedly identified deficiencies by Green in terms of situational awareness when making left turns, precisely the maneuver that was executed by Green on the day of the accident. In fact, some 57 deficiencies relating to left hand turns were documented by Green's instructors between December 31, 2010, and the end of January, 2011. The narratives that accompany these training records also would permit an inference that FFE had a subjective awareness of the dangers posed by Green's erratic test driving performance. According to the training records, the driving instructor "had to constantly stay on [Green] to check mirrors and cancel turn signal;" cited Green for "not doing traffic checks;" stated that "at times[it was] extremely difficult to instruct [Green to] follow[] simple directions;" and warned that Green "has way too many excuses" while the instructor observed that he was "trying desperately to get [Green] to understand good driving habits." (Doc. 108-11).

(Doc. 125, at 16-17).

Defendants do not dispute the above-cited evidence, instead arguing that Green passed the training program, upon completion of the program "began driving and did well", a statement the Court assumes is based on Defendants' assertion that Green "had not been in one accident since the time he had been authorized to drive solo", and that "Plaintiff and the U.S. Magistrate Judge do not explain how several accidents and the failure to follow safety guidelines by a truck driver do not amount to more than gross negligence under

*Calhoun*[1]." (Doc. 127, at 9). Defendants further state that prior to hiring Green, "FFE reviewed Green's application, conducted a Motor Vehicle Record check and did not note any accidents or incidents. FFE investigated Green's prior record with Star Transport, another company he drove commercial vehicles for and the response provided from that company was that his performance was 'Satisfactory.' FFE also performed an investigation into non-DOT positions, criminal background check and even sent Green to a refresher course where he received 130 hours of additional training." (*Id.* at 10) (internal citations omitted).

Defendants' assertions are insufficient to establish the lack of a factual dispute. Rather, despite Defendants' list of reasons that their conduct cannot be found to be outrageous or recklessly indifferent, the deposition of Tommy Dodd in particular, raises issues of fact as to Defendants' state of mind and motives for allowing Green to drive alone and whether they purposefully overlooked the risk of harm that Green may have posed to the public. Although Tommy Dodd, Green's trainer, testified that he would not have "passed" Green in February, 2011 if he did not feel that Green was ready to drive (Dep. of

---

[1] Defendants argue that this Court's prior decision in *Calhoun v. Van Loon*, 2014 WL 3428876 (M.D. Pa. 2014), wherein it granted summary judgment to Defendants on Plaintiffs' claims of punitive damages, is applicable to the present action. However, *Calhoon* is distinguishable. In *Calhoon*, Defendant Van Loon, while backing his tractor-trailer into a parking place in a parking lot, collided with Plaintiff's parked tractor trailer at low speed, causing injuries to the plaintiff. Although Van Loon had been in a previous accident wherein he backed into another car, the company provided him additional training as a result. The present case is inapposite, where Green had numerous training deficiencies noted on his record, his trainer, although passing him in the program, expressed serious concerns about Green's driving to the company, and Green's noted driving deficiencies were relevant to his ability to safely drive long distances on highways, not simply issues with parking a truck at low speed, where the danger to the public is arguably much lower and less likely to result in catastrophic injuries or death.

4

Dodd, Doc. 108-10, at 109) and that Dodd had failed more people than he "signed off for upgrade" (*id.* at 23), Dodd also testified as follows:

> **Q.** After five weeks of -- after five weeks of evaluating this particular individual, you went in and had a meeting with the training department, right?
>
> **A.** Yes, sir.
>
> **Q.** No week during this process -- at no time did you ever pass him during this process in those five weeks, right?
>
> **A.** Yes, sir.
>
> **Q.** Okay. Did you recommend that they fire him?
>
> **A.** I didn't recommend that they fire him. I recommended that -- that he was -- he was unsafe.
>
> **Q.** Okay.
>
> **A.** And that, you know, it -- the conversation basically went down as I explained to them what happened. I had turned in the evaluation forms. And -- and I -- and, you know, I told them, I said, "These are - - these are my concerns." And --
>
> **Q.** What were your concerns, Tom?
>
> **A.** The not -- not following instruction, not paying attention to signs, you know, and, of course, that -- that one major one where -- where he could have potentially hurt somebody.
>
> **Q.** Okay. So you expressed to FFE your concerns that this driver was not safe.
>
> **A.** Yeah.
>
> **Q.** Okay. Certainly someone who is driving a truck that is not safe can injure someone with that truck, right?

5

A. Yes, sir.

Q. Is that something is that something that was -- well, let me put it to you this way: Did FFE understand your concerns regarding the safety of this driver when you left that meeting?

....

A. I don't -- I can't -- I can't say what they were -- what they were thinking. I don't know what they were thinking. All I know is -- is what I had -- all I know is what I had told them and then what they had told me.

Q. Right. Well, what did you just say; all you know is what they told you?

A. I mean, you know, I can't say what they were thinking when I presented all of the -- all of the facts to them.

Q. Right. Did they tell you anything other than keep working with him?

A. Basically, you know, give him another chance, you know, if -- if we put him with another trainer, he'll have to start all over again. And, you know, they were -- at that time, you know, they were looking for a -- a good success rate.

Q. So you feel like they wanted him to do well because they needed, drivers?

A. Yes.

Q. Okay. Was there a driver shortage at that time at FFE?

A. There's always a driver shortage.

Q. That wasn't my question, though.

A. Yes, you could say that.

Q. My question was -- okay. Was there pressure on you to make sure that the drivers in your training course were graduating so that FFE had drivers to drive their trucks?

A. At times, yes, I did -- I did feel -- I did feel that pressure.

6

> **Q.** Did you feel that pressure with Mr. Green?
>
> **A.** Yes, when they when they encouraged me to keep working with him.
>
> **Q.** Okay. One second, Mr. Dodd. Tommy, you keep saying that he -- the only alternative was to put him with another driver and they'd have to start all over again, but is that something that you thought that he should do, start his training again?
>
> **A.** Personally and this is just my personal opinion: They -- they should have let him go with that citation. That's my personal –
>
> **Q.** So you think they should have dismissed him?
>
> **A.** Yes, that's my personal opinion.

(*Id.* at 78-81). Dodd's testimony, in conjunction with the numerous deficiencies noted in the training records which occurred only months prior to the accident at issue in this case, are sufficient to create a factual dispute with respect to FFE's state of mind, motives for allowing Green to drive alone, and knowledge of the risks he posed when driving.

Magistrate Judge Carlson recognized the "exceedingly high standard for the award of punitive damages" (Doc. 125, at 11) and no party disputes the law set forth by the Magistrate Judge with respect to the standard governing the award of punitive damages in Pennsylvania. Additionally, while finding that material disputes of fact exist such that summary judgment must be denied, Magistrate Judge Carlson carefully emphasized, and this Court reiterates, that the Court is "not opin[ing] [ ] whether Botey can ultimately meet these exacting standards at trial." (Doc. 125, at 15). As the Magistrate Judge properly noted, the evidence submitted by the parties, when viewed in a light most favorable to the

7

plaintiff, "may permit an inference that the defendants were aware of a significant risk to safety posed by Green's driving, and failed to act in the face of this known risk. Recognizing that the evidence may permit such an inference, which in turn would support a claim for punitive damages, our course of action in this case is clear." (Doc. 125, at 17).

Defendants' second basis for why this Court should not adopt Magistrate Judge Carlson's R&R in its entirety argues that the Magistrate Judge "impliedly found that Plaintiff's evidence applies to all three defendants" and that "it is arguable how the evidence gives FFE an appreciation of the risk of harm, but is non-existent against Green and Conwell." (Doc. 127, at 11-12).

In Defendants' Motion for Partial Summary Judgment, they briefly argued that Conwell LLC, which does business as FFE, employed Green, and that Plaintiff improperly named Conwell Corporation, not Conwell LLC, as a defendant in the Amended Complaint. (Doc. 105, at 6). Defendant further argued that Conwell Corporation's "only relationship to this matter is the ownership of the tractor-trailer Green was driving and as there has been no evidence presented that the vehicle was in anyway malfunctioning, in disrepair or was a cause of this accident, Conwell Corporation should be dismissed from this action, in its entirety." (Doc. 105, at 6 n.6). Defendants raise this issue again in their Objections to the R&R, pointing out that the Magistrate Judge does not address this point. (Doc. 127, at 13). In response, Plaintiff cites to one document, entitled "Conwell Corporation Experienced Driver Information" for the proposition that "documents produced in discovery regarding

Defendant Green's hire by FFE Defendants bear the corporate name, Conwell Corporation" and therefore "at a minimum, this creates a genuine issue of material fact on the issue precluding summary judgment." (Doc. 108, at 1 n.1; Doc. 128, at 1 n.1, 11-12) (citing Doc. 108-6). Nonetheless, Defendants' argument fails because they have provided no evidence to support their self-serving statement that Conwell Corporation's involvement in this action is limited to its supplying the truck at issue, is a separate entity from Conwell, LLC, and was not involved in Green's hiring or training. As such, Defendants have failed to carry their initial burden on summary judgment and their request that Conwell Corporation be dismissed in its entirety must be denied as genuine disputes of material facts exists as to the relationship, if any, between Conwell, LLC and Conwell Corporation, whether Conwell Corporation was also Plaintiff's employer, and the extent, if any, of its involvement in, and knowledge of, the events leading up to the accident at issue.

Because of the above genuine dispute of fact, the Court also cannot determine the extent to which FFE's training records were available to Conwell Corporation and what control Conwell Corporation had over FFE's decisions with respect to its drivers, and therefore cannot determine Conwell Corporation's subjective awareness of the risk of harm to which Botey was exposed and whether it acted or failed to act in conscious disregard of that risk.

The Magistrate Judge also properly applied the evidence contained in the FFE training records in determining that a genuine dispute of material fact existed with respect to

the punitive damage claim against Green. Defendant Green was aware of his numerous deficiencies during training, such as failing to pay attention to signs, including a stop sign (Doc. 108-11), not doing traffic checks (*id.*), and at times being "extremely difficult to instruct[,] following simple directions[,] too many excuses" (*id.*). Therefore, a reasonable fact-finder may find that the record evidence found in FFE's training records sufficiently supports a conclusion that Green was subjectively aware of the risk of his actions and that he acted or failed to act in conscious disregard of that risk.

For the aforementioned reasons, the Court will adopt Magistrate Judge Carlson's R&R (Doc. 125) in its entirety. A separate order follows.

/s/ Robert D. Mariani
Robert D. Mariani
United States District Court Judge