THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JONATHAN BOTEY,                          :
                                         :
              Plaintiff                  :
       v.                                :       3:12-CV-1520
                                         :       (JUDGE MARIANI)
ROBERT GREEN, et al.,                    :
                                         :
              Defendants                 :

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury trial was held in the above-captioned case in June of 2017. At the conclusion of the trial, the jury returned a verdict in favor of Defendants Robert Green and FFE Transportation Services ("FFE")[1] and against Plaintiff Jonathan Botey.

Now before the Court is "Plaintiff's Motion for New Trial Pursuant to Federal Rule of Civil Procedure 59" (Doc. 340). For the reasons set forth below, the Court will deny the plaintiff's motion in its entirety.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the factual background of this case is thoroughly familiar to all parties and has been discussed at length by the Court before (*see e.g., generally*, Mem. Op. Granting in Part and Denying in Part Mot. for Sanctions, Doc. 123; R&R, Doc. 125), a detailed

---

[1] Although this action was also originally brought against Conwell Corporation, Plaintiff's counsel agreed to dismiss Conwell from the action during the charge conference. (Trial Tr., June 21, 2017, at 32-33).

discussion of the facts of the case is unnecessary here. Briefly, for purposes relevant to the present motion, on August 6, 2012, this action was removed from the Court of Common Pleas of Lackawanna County. Plaintiff Jonathan Botey's Amended Complaint alleged Negligence against Robert Green, Conwell Corporation, and FFE Transportation Services, Inc. (Counts I, II, III), and further requested punitive damages against each of the Defendants (Counts IV, V, VI) as the result of an accident which occurred on May 10, 2011, between Botey and Green, a trucker operating a tractor-trailer owned by Conwell Corporation and registered to FFE Transportation Services, Inc., on State Route 924 in Hazleton, Pennsylvania. (Doc. 1).

On March 11, 2015, Plaintiff filed a Motion for Sanctions (Doc. 74) in response to alleged spoliation of evidence by Defendants Conwell Corporation and FFE. Although the Court denied Plaintiff's request that an adverse inference jury instruction be read against Defendants at the time of trial, the Court granted Plaintiff's request that Defendants be precluded from arguing in any dispositive motions that the plaintiff lacked evidence to prove his corporate negligence claims against Defendants FFE and Conwell based on the documents destroyed in so far as Defendants were precluded from proving the contents of the destroyed documents by other means or arguing their contents in dispositive motions or at trial. (Docs. 123, 124).

On September 9, 2015, Defendants filed a Motion for Partial Summary Judgment requesting that the Court dismiss the punitive damage claims against Green, FFE, and

Conwell, as well as Plaintiff's claims for negligent qualification, hiring, supervision, monitoring, training, and entrustment against FFE and Conwell contained in Counts II and III. (Doc. 103). The Motion was referred to Magistrate Judge Martin Carlson who recommended denying Defendants' Motion (Doc. 125). Upon *de novo* review, the Court adopted the R&R. (Docs. 130, 131).

A jury trial was held from June 12, 2017 through June 21, 2017. After deliberation, the jury found in favor of Defendants. Specifically, in response to Question 1, "Do you find by a preponderance of the evidence that Robert Green was negligent?", the jury responded "No." (Doc. 334, at 2). As a result, the jury did not answer any further special verdict questions and jury deliberations were concluded.

The Court entered judgment on June 22, 2017 (Doc. 335) and Plaintiff timely filed the instant Rule 59 motion pursuant to the Federal Rules of Civil Procedure (Doc. 340).

### III. STANDARD OF REVIEW

A losing party may move for a new trial or to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59.

"The court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). The Court may grant a new trial "purely on a question of law;" or to correct a previous ruling "on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings or prejudicial

statements made by counsel" or "because [the Court] believes the jury's decision is against the weight of the evidence", among other grounds.  *Klein v. Hollings*, 992 F.2d 1285, 1289-1290 (3d Cir. 1993) (internal citations omitted).  While the Court has wide discretion to order a new trial to correct rulings that initially rested in its discretion, it has relatively narrow discretion to overturn a verdict on the grounds that the verdict is against the weight of the evidence.  *Id.*  This is because

> where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960).

> Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand.  Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations . . . .

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (internal citations omitted).

The Court may also alter or amend a judgment pursuant to Fed. R. Civ. P. 59(e), otherwise known as a motion for reconsideration.  *See Keifer v. Reinhart Foodservices, LLC.*, 563 F.App'x 112, 114 (3d Cir. 2014).  A motion to alter or amend "must rely on one of three

major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (internal quotation marks and brackets omitted); *see also, Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Thus, when a jury errs as a matter of law, a Court may rectify this error through a Rule 59(e) motion. *Keifer*, 563 F.App'x. at 115; *see also, United States v. Fiorelli,* 337 F.3d 282, 288 (3d Cir. 2003) ("A motion under Rule 59(e) is a 'device to relitigate the original issue' decided by the district court, and used to allege legal error") (quoting *Smith v. Evans,* 853 F.2d 155, 158-159 (3d Cir. 1988)). However, "motions for reconsideration should not be used to put forward arguments which the movant . . . could have made but neglected to make before judgment." *United States v. Jasin*, 292 F.Supp.2d 670, 677 (E.D. Pa. 2003) (internal quotation marks and alterations omitted) (quoting *Reich v. Compton*, 834 F.Supp.2d 753, 755 (E.D. Pa. 1993) *rev'd in part and aff'd in part on other grounds*, 57 F.3d 270 (3d Cir. 1995)). Nor should they "be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Donegan v. Livingston*, 877 F.Supp.2d 212, 226 (M.D. Pa. 2012) (quoting *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002)). Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should only be granted sparingly. *Cont'l Cas. Co. v.*

*Diversified Indus., Inc.,* 884 F.Supp. 937, 943 (E.D. Pa. 1995) (citing *Rottmund v. Cont'l Assurance Co.,* 813 F.Supp. 1104, 1107 (E.D. Pa. 1992)).[2]

## IV. ANALYSIS

Plaintiff's motion is divided into seven sections, each attempting to provide a separate basis for the grant of a new trial. (*See generally*, Doc. 360). The Court will address these arguments in turn.

### A. The Jury's Verdict

Plaintiff first asserts that a new trial should be granted because the verdict was against the weight of the evidence.

"A Rule 59(a)(1) motion seeking a new trial on the ground that the judgment is against the weight of the evidence is warranted only when the verdict is so against the evidence as to constitute a miscarriage of justice." 1 Moore's Federal Rules Pamphlet § 59.3[3] (Matthew Bender)(2016). Therefore, although a new trial may be granted even if the evidence is legally sufficient to support the verdict, "a district court should grant a new trial on the basis that the verdict was contrary to the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1076 (3d Cir. 1996) (quoting *Roebuck v. Drexel Univ.,* 852 F.2d 715, 735-36 (3d Cir. 1988); *Williamson,* 926 F.2d at 1352); *see also,*

---

[2] Plaintiff's motion and accompanying brief fail to specify what section of Rule 59 the plaintiff relies on in bringing his motion. Although the Court has set forth the standard of review under both Rule 59(a) and Rule 59(e), because Plaintiff's filings only reference a motion for a new trial, and lack any reference to a motion to alter or amend the judgment, and fail to set forth any of the applicable law under Rule 59(e), the Court must assume that Plaintiff is attempting to proceed solely under Rule 59(a).

*Williamson*, 926 F.2d at 1353 ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."). The Third Circuit has characterized this as a "stringent standard" necessary "to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Sheridan*, 100 F.3d at 1076 (internal quotation marks omitted).[3]

Plaintiff argues that that the jury's verdict finding that Green was not negligent "is clearly against the weight of the evidence such that a miscarriage of justice would result of the verdict were to stand." (Doc. 360, at 2). In support of his argument, Plaintiff claims that "it is undisputed that Defendant Green violated [Pennsylvania Vehicle Code, 75 Pa. C.S.A. § 3324] and was negligent per se". (Doc. 360, at 5; *see also, id.* at 2).

Pursuant to 75 Pa. C.S.A. § 3324, "[t]he driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right-of-way to all vehicles approaching on the roadway to be entered or crossed."

---

[3] Because Plaintiff did not move for judgment as a matter of law at the close of the evidence pursuant to Federal Rule of Procedure 50, he is precluded from now seeking a new trial on the basis that the evidence was insufficient to support the jury's verdict. Nonetheless, while Botey may not make a post-trial attack on the sufficiency of the evidence, Rule 59 permits him to request a new trial on the basis that the verdict was against the weight of the evidence, as opposed to the sufficiency of the evidence. *See Greenleaf v. Garlock Inc.*, 174 F.3d 352, 364-65 (3d Cir. 1999). However, "[u]nlike a sufficiency of the evidence claim, when a court evaluates a challenge to the weight of the evidence it does not view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n.18 (3d Cir. 2007).

Because Plaintiff asserts that the evidence at trial "indisputably shows that Defendant Green failed to yield the right-of-way to Botey" (Doc. 360 at 2), Plaintiff believes that the jury necessarily had to find Green negligent. To support this position, Plaintiff cites the testimony of his expert Whitney Morgan, who was admitted at trial as an expert in the field of commercial motor vehicle compliance and safety (*see* Trial Tr., June 13, 2017, at 32-33), and Defendants' expert Steven Rickard, admitted at trial as an expert in accident investigation and reconstruction (*see* Trial Tr., June 20, 2017, at 95). (Doc. 360, at 3-5).

At trial, Morgan acknowledged that in his report he found that Green did not yield the right-of-way, explaining that "the vehicle that is established on the highway has the right-of-way, so the vehicle that is then pulling into traffic is obligated to let that traffic clear, before they encroach into the lanes of travel." (Trial Tr., June 13, 2017, at 76).

Despite this explanation, Morgan's opinions were all based on the premise that Botey was actually *on the roadway* and that Botey's vehicle was, in fact, "established on the highway", facts that were not undisputedly established at trial. Instead, as defense counsel repeatedly made clear in his examination of a number of witnesses, including Morgan, no person could definitively state where Botey was coming from at the time of the accident, other than his general direction.[4]

---

[4] For example, at trial, Morgan testified as follows on cross-examination:

Q. You do not have and haven't conducted an accident reconstruction investigation, of course, into where Mr. Botey was on the roadway, at the time Mr. Green made the decision to start into the roadway. You don't know exactly where Mr. Botey was, do you?

Furthermore, despite Plaintiff's assertion that Defendants' expert, Steven Rickard, "testified that Plaintiff Jonathan Botey had the right of way" and that "Rickard agreed that if Defendant Green had yielded the right of way to Mr. Botey, the subject collision would not have occurred" (Doc. 360, at 3-4), this misrepresents Rickard's testimony.

---

**A**. No sir.

**Q**. Thank you. You saw Mr. Botey's deposition, which you read, also; correct?

**A**. Correct.

**Q**. He has no recollection of the accident whatsoever; correct?

**A**. That's my understanding, yes.

**Q**. Where he was coming from or where he was going or what -- first of all, just those two; where he's coming from, where he's going. Right?

**A**. Yes.

(Trial Tr., June 13, 2017, at 113).

Similarly, Defendants' expert Steven Rickard testified that there was no evidence that put Botey in Green's lane of travel, and agreed with defense counsel that it is unknown whether prior to the accident Green was on the shoulder, or "over in th[e] yellow turn lane, getting ready to try to get back on, because, for whatever reason, he was over on the other side of the road, and he's right next to the lane he was in, [Green] start[s] to make [his] turn, [Botey] gets out of the old turn lane, gets in his lane of travel, going 42 miles an hour and runs into [Green]. We don't know." (Trial Tr., June 20, 2017, at 119; *see also, id.* at 115, 116, 156, 163). According to Rickard, "[t]here's no witnesses that I know of that are able to say where Mr. Botey came from." (*Id.* at 163).

In addition, in response to a question by Plaintiff's counsel, Derek Strauss, one of the eyewitnesses to the accident, stated that he did not know where Botey's car came from; specifically "[h]e could have come out of -- from the light, he could have come out from across the street. There was several places he could have come from -- . . . -- onto [Route] 924" (Dep. of Strauss, at 77).

In support of his argument, Plaintiff cites to the following exchange, among others[5],

between Plaintiff's counsel and Rickard:

> **Q.** I'm asking you a specific question. If Jonathan Botey is 310 feet back from the point of impact when Mr. Green pulls out, doesn't Jonathan Botey have the right-of-way?
>
> **A.** Technically, yes.
>
> **Q.** And he said 5 to 7, so to be fair to you, sir, 7 times 62 feet a second is 434 feet back. I'm going to ask you the same question. If Jonathan Botey is 434 feet back from the scene of the crash, point of impact, *he's on the roadway*, approaching the scene of the impact, doesn't Jonathan Botey have the right-of-way?
>
> **A.** Technically, he does.
>
> **Q.** Correct. Now, sir, I want to ask you, finally, if Mr. Green stayed where he was and did not pull out and yielded the right-of-way, this crash never would have happened. Isn't that true?
>
> **A.** I would have to agree.

(Doc. 360, at 4)(quoting Trial Tr., June 20, 2017, at 158) (emphasis added). This exchange

as evidence that Botey undisputedly had the right-of-way ignores the fact that Plaintiff's

counsel's question had Rickard assume that Botey was, in fact, on the roadway. Further,

this exchange is undermined by Rickard's repeated statements that it is unknown where

Botey was coming from prior to the accident, a fact which was echoed by both Morgan and

Strauss, *see supra,* n. 4. Thus, Plaintiff's counsel's aforementioned questions, and

---

[5] Although Plaintiff quotes two other portions of Rickard's testimony (Doc. 360, at 4), neither portion relates to the specific facts of the accident, and instead merely consist of Rickard agreeing with Plaintiff's counsel's reiteration of the language of § 3324 and general explanation of the statute's meaning.

Rickard's answers, are only of import to the extent that the jury believed that Plaintiff established by a preponderance of the evidence that Botey was actually on the roadway at the time Green began exiting the gas station.

Finally, Plaintiff's position that Green must be found to have been negligent *per se* is further weakened by testimony that, following an investigation by Trooper Nalepa, Green was not cited for violating any person's right-of-way. (*See* Trial Tr., June 20, 2017, at 166). The jury may have reasonably found the undisputed fact that a law enforcement officer who was present immediately after the accident, spoke to the witnesses, and investigated the accident, did not determine that Green had violated § 3324 or any other traffic law, to be probative of the issue of whether Green was negligent *per se.*

In summary, Plaintiff's argument is based on the flawed fundamental premise that Botey actually had the right of way. Plaintiff presented little evidence during trial to support this position, including evidence as to where Botey's vehicle was in the moments prior to the accident. Plaintiff Botey was unaided by the fact that he could not remember anything immediately prior to the accident. In contrast, Defendants created a significant question, both through cross-examination and through their own witnesses and evidence, to place Botey's location prior to the accident at issue. Defendants' evidence included detailed testimony by Rickard, the only accident reconstructionist called as a witness at trial, who testified that "we" do not know what Botey's speed was when Green first entered the roadway or where Botey was prior to the accident, including whether Botey was in Green's

lane of travel. (Trial Tr., June 20, 2017, at 119-120). Rickard's testimony also revealed, perhaps most troubling to the jury and completely unexplained by Plaintiff, that Botey was traveling at 42 mph at the time of the accident and made no attempt to brake or take his foot off the accelerator in the five seconds prior to the collision (*id.* at 104-105, 115, 117-118).

Ultimately, just as in most trials, this case required the jury to make a credibility determination as to each of the witnesses presented by Plaintiff and Defendants. While there was testimony which may have supported a finding that Green was negligent, there was also sufficient testimony and evidence which would reasonably justify a jury's finding that Plaintiff did not meet his burden by a preponderance of the evidence of demonstrating negligence or negligence *per se.* The jury had the benefit of seeing each witness and hearing each witness's testimony and the personal knowledge which formed the basis for their testimony, as well as observing their body language and general demeanor in assessing the credibility of each witness. Based on this, the jury found in favor of Robert Green and thus also FFE. Consequently, the Court will deny Plaintiff's motion for a new trial on the basis that the verdict was against the weight of the evidence. Plaintiff's assertion that he is entitled to a new trial on the grounds that Green was negligent *per se* ignores that the jury may not have believed that Green violated § 3324. In the absence of this belief by the jury and sufficient evidence demonstrating that there was, in fact, a violation of § 3324, it is not for the Court to take the extreme remedy of overturning the jury's determination that Plaintiff failed to establish by a preponderance of the evidence that Green was negligent *per*

*se.* Nor can this Court say that the jury's verdict resulted in a miscarriage of justice or shocks the conscience.

## B. The Testimony of Derek Strauss and Gurjit Sanghera

The majority of Plaintiff's motion and supporting brief focus on a number of purported errors by this Court with respect to the testimony of eyewitnesses Derek Strauss and, to a lesser extent, Gurjit Sanghera. Plaintiff argues that a new trial is warranted because the Court "erroneously permitted the introduction into evidence of inadmissible lay witness opinion testimony", thus erring in the following ways:

> (1) permitting into evidence the prior recorded statement of lay witness Derek Strauss; (2) permitting evidence of lay witnesses Derek Strauss and Gurjit Sanghera['s] improper opinions regarding the cause of the collision and who was at fault; and (3) permitting Defendant's expert Steven Rickard to reiterate the inadmissible lay opinion testimony of witnesses Derek Strauss and Gurjit Sanghera.

(Doc. 360, at 5). More specifically, Plaintiff asserts that the Court erred in admitting the lay opinion testimony of Strauss regarding how the accident occurred and who was at fault because: (1) Strauss lacked a sufficient factual basis to offer an opinion as to the cause of the collision and/or who was at fault; (2) Strauss' opinion regarding how the collision occurred and who was at fault was not helpful to the trier of fact; and (3) Strauss was not qualified to offer an opinion as to the cause of the collision or who was at fault. Plaintiff further asserts that the Court erred in admitting lay opinion testimony by Strauss regarding the speed of Botey's vehicle as well as "improper" lay opinions by Sanghera and that the recorded statements of Strauss and Sanghera were inadmissible hearsay and should have

been precluded. Finally, Plaintiff asserts that Defendants' expert Steven Rickard was impermissibly permitted to reiterate the inadmissible lay opinion and hearsay statements of Strauss and Sanghera. (*See id.* at 10-33).

Pursuant to Federal Rule of Evidence 701, the opinion testimony of a witness who is not testifying as an expert is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [governing expert witness testimony].

Fed. R. Evid. 701. Types of "quintessential Rule 701 opinion testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, the value of one's property, and other situations in which the differences between fact and opinion blur and it is difficult or cumbersome for the examiner to elicit an answer from the witness that will not be expressed in the form of an opinion." *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1197-1198 (3d Cir. 1995).[6]

The Third Circuit has explained the contours of Rule 701 as follows:

---

[6] Although Rule 701 was amended in 2000 to also limit a lay witness to testimony which is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702", the Advisory Committee Notes with respect to this amendment make clear that "[t]he amendment is not intended to affect the 'prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.' *Asplundh Mfg. Div. v. Benton Harbor Eng' g*, 57 F.3d 1190, 1196 (3d Cir. 1995).'" Fed. R. Evid. 701 advisory committee notes for the 2000 amendments.

Rule 701 means that a witness is only permitted to give her opinion or interpretation of an event when she has some personal knowledge of that incident. The objective of such testimony is to put "'the trier of fact in possession of an accurate reproduction of the event.'" In other words, "'lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" This rule recognizes the reality that "eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts." Accordingly, it permits witnesses "to testify to their personal perceptions in the form of inferences or conclusory opinions."

Importantly, the rule is carefully designed to exclude lay opinion testimony that "amounts to little more than choosing up sides, or that merely tells the jury what result to reach." Courts have recognized that this Rule does represent "'a movement away from ... courts' historically skeptical view of lay opinion evidence,' and is 'rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admissibility.'" Nonetheless, it seeks to protect against testimony that usurps the jury's role as fact finder. While opinion testimony that "embraces an ultimate issue" to be decided by the trier of fact is not *per se* inadmissible, such testimony is barred when its primary value is to dictate a certain conclusion. "[T]he purpose of the foundation requirements of the federal rules governing opinion evidence is to ensure that such testimony does not so usurp the fact-finding function of the jury."

*United States v. Fulton*, 837 F.3d 281, 291-292 (3d Cir. 2016) (footnotes omitted).

Similarly,

courts have permitted witnesses with firsthand knowledge to offer lay opinion testimony where they have a reasonable basis – grounded either in experience or specialized knowledge – for arriving at the opinion expressed. A conclusion by the trial court that the witness possessed sufficient experience or specialized knowledge has thus often been used to determine that the witness's opinion testimony satisfies the requirements that the opinion be both "helpful to a clear understanding ... of a fact in issue" and

"rationally based" upon the witness's perception, as expressed in the text of Rule 701.

*Asplundh*, 57 F.3d at 1198. *See also, Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) ("[A]n expert is [not] always necessary whenever the testimony is of a specialized or technical nature. When a lay witness has particularized knowledge by virtue of her experience, she may testify – even if the subject matter is specialized or technical – because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."). As such, "'[t]he essential difference between [Rule 701 and 702 testimony] . . . is that a qualified expert may answer hypothetical questions.' *Teen-Ed, Inc. v. Kimball Int'l Inc.*, 620 F.2d 399, 404 (3d Cir. 1980). Moreover, Rule 704 of the Federal Rules of Evidence authorizes the admission of the opinion of lay witnesses regarding the ultimate issues to be decided by the trier of fact. Fed.R.Evid. 704." *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 356 (3d Cir. 1998).

Here, Plaintiff admits that Strauss and Sanghera "are permitted, under the rules, to testify regarding what they saw and what they heard" but argues that they "are not permitted to offer an opinion regarding how the accident occurred or who was at fault." (Doc. 360, at 10).

Having set forth the general law governing lay witness testimony, the Court will address Plaintiff's arguments in turn.

**1. Lay Opinion Testimony of Derek Strauss regarding how the accident occurred and who was at fault.**

Plaintiff first addresses Strauss' testimony "regarding how the accident occurred and who was at fault" (Doc. 360, at 10), breaking this argument into three sections – each addressing the application of a subsection of Rule 701 to Strauss' purported opinions as to the cause of the collision and who was at fault.

Although Plaintiff argues that the Court erred in allowing certain deposition testimony by Strauss, a review of Plaintiff's arguments reveals that Plaintiff is, in actuality, objecting only to statements made in one portion of Strauss' recorded statement. None of Plaintiff's objections are derived from Strauss' videotaped deposition testimony which was shown to the jury.[7] Specifically, Plaintiff focuses on the following portion of Strauss' recorded statement:

> **Q**: Okay. In your opinion you know, as witnessing the accident, did you have any opinion on whose fault the accident was or what happened?
>
> **A**: It would truly be opinion in what I think happened was the driver of the Bravada was distracted in some way.
>
> **Q**: Okay.

---

[7] Nor can Plaintiff now object to any portion of Strauss' video deposition which was shown to the jury. Although Plaintiff's counsel specifically objected at trial to Strauss' deposition testimony being shown to the jury, this objection was not an objection as to the substance of Strauss' testimony – rather, Plaintiff's objection "to the playing of the deposition of Mr. Strauss" was premised on an argument that Strauss should be made to testify in person. (Trial Tr., June 19, 2017, at 93-94). As Plaintiff's counsel stated, "I just want to preserve my objection on *that particular issue.*" (*Id.* at 94) (emphasis added). Further, at no time during the presentation of Strauss' deposition testimony to the jury did Plaintiff raise any objections.

However, following the presentation of Strauss' videotaped deposition, the defendants moved for the admission of the recorded statement of Strauss, a statement taken approximately one week after the May 10, 2011 accident. At this time Plaintiff stated, "[n]o objection, for demonstrative purposes," but objected to the recorded statement going back with the jury on the basis, broadly construed, that the statement was not properly authenticated (Trial Tr., June 20, 2017, at 23-24), an argument rejected by the Court at trial and again herein, *infra.*

**A**: Because there was, as I said, no attempt to brake, no attempt to turn, and in my uneducated guess, he was not doing the speed limit, he was over the speed limit.

**Q**: Okay.

**A**: With looking at how far he went under the truck.

(Doc. 360, at 15-16) (quoting Recorded Statement of Strauss, at 7).

> i. **Whether Strauss lacked a sufficient factual basis to offer an opinion as to the cause of the collision and/or who was at fault and whether such an opinion was helpful to the trier of fact.**

Pursuant to Federal Rule of Evidence 701(a) and (b), the opinion testimony of a witness who is not testifying as an expert must be rationally based on the witness's perception and must be helpful to clearly understanding the witness's testimony or to determining a fact in issue. Plaintiff asserts that Strauss lacked a sufficient factual basis to opine as to the cause of the collision and who was at fault and that Strauss' opinion on this issue "did not assist the trier of fact." (Doc. 360, at 12, 16).

With the exception of the afore-quoted portion of Strauss' recorded statement, Plaintiff does not point to any other specific statement by Strauss which Plaintiff believes demonstrates that Strauss opined as to the cause of the collision or fault for the collision.[8]

---

[8] Plaintiff dedicates one page to the issue of whether Strauss' opinion was helpful to the trier of fact and fails to offer any substantive argument as to why he believes the opinions at issue were not helpful. Instead, Plaintiff broadly asserts, without explanation, that "such testimony served only to confuse the jury and impermissibly infringed on the jury's exclusive right to determine the liability of the parties involved in the subject wreck." (Doc. 360, at 16-17).

Although Plaintiff admits that Strauss "may have see[n] the actual collision" (Doc. 360, at 15), Plaintiff contends that "[t]he testimony of Mr. Strauss clearly shows that he did not see Mr. Botey or his vehicle prior to the collision" (Doc. 360, at 12).  Plaintiff's assertion that Strauss did not see Botey's vehicle prior to the accident is contradicted by the testimony of record, some of which Plaintiff quotes in his supporting brief.

During his deposition, Strauss explained that at the time of the accident, he was outside his truck, about 50-75 yards away from the exit or driveway of Fuel On, and that there were no obstructions to his view of the actual accident.  (Dep. of Strauss, at 23, 25). However, Strauss testified that from his position, he could not see "very far [to the left/South] because the building was [ ] in the way."  (*Id.* at 26; *see also*, *id.* at 48).  Strauss therefore estimated that he first saw Botey's vehicle coming towards the tractor-trailer about 20-30 yards, *i.e.* approximately 90 feet, prior to the actual impact.  (*Id.* at 28, 77).  Although Strauss admitted that he did not have a chance to observe Botey "operating or driving the SUV before the accident happened", he did "register[ ] that there was a vehicle moving towards the truck . . ." (*id.* at 29; *see also*, *id.* at 51 (admitting that he first saw Botey's car "just before impact")). Strauss approximated that he thus saw Botey's car for "a second or so" before impact. (*Id.* at 79).  Strauss previously made this same time estimate in his recorded statement, wherein he stated that he saw a "white blur" for "a fraction you know, a second at the most, second or two at the most before the accident."  (Recorded Statement of Strauss, at 4).  Strauss' deposition testimony therefore makes clear that, while Strauss only had an opportunity to

observe Botey's vehicle for one to two seconds prior to the accident, he did in fact see the vehicle before the collision, testimony that is consistent with his recorded statement on this issue. The fact that Strauss did not observe the vehicle for a longer period of time goes to the weight that a trier of fact may decide to accord Strauss' testimony on the subject as well as to Strauss' credibility – it does not, as Plaintiff contends, somehow equate to an argument that Strauss did not see Botey's vehicle at all prior to the collision.

Plaintiff also asserts that Strauss "lacks a sufficient factual foundation to offer any testimony that Mr. Botey was distracted" (Doc. 360, at 12), a reference to Strauss' comment in his recorded statement. Strauss never made a similar statement in his deposition shown to the jury, nor did he state in his deposition in any other fashion that Botey was at fault. Rather, when Strauss was questioned during his deposition about who he thought was at fault for the accident, he responded "I wouldn't even want to answer that one, sir, honestly." (Dep. of Strauss, at 34).

Instead, while Strauss did not opine as to fault or the cause of the collision in his deposition, he did set forth a number of factual observations based on his personal perception of the situation which the jury may have found helpful in determining fault and/or causation. Strauss, who stated that he had a clear view of Green's truck, testified that at the point of impact, the "tractor trailer was across both of the northbound lanes . . . as well as [Green] was in that center turning lane . . . So he was covering one, two, three whole lanes of road." (Dep. of Strauss, at 26). In his deposition, Strauss also confirmed that in his recorded

statement he stated that Green was "past the point of no return", testifying that he "consider[s] the point of no return being that white line that separates the travel lane from the shoulder. Once you step past that, you're on the road. You – you either go or you – you're going to get hit." (*Id.* at 26-27). As such, Strauss testified that in his opinion, Green's tractor trailer had "[a]bsolutely" established itself across both northbound lanes of Route 924 as well as the turning lane. (*Id.* at 27). Strauss' statements on this subject are not only based on his personal observations, but also on his extensive experience as a truck driver who had driven this route numerous times.[9]

Additionally, in describing the accident, Strauss testified that he heard "no horns, no brakes, sounds, nothing. I saw the white SUV and I heard the bang of the crash." Strauss further explained that "[i]t didn't look like [the SUV] had tried to turn." (*Id.* at 29).

In describing the area surrounding where the accident occurred, Strauss testified that "[l]ooking down 924 either way . . . there should not have been anything blocking [Green's] vision as he pulled onto 924." (Dep. of Strauss, at 41). Similarly, Strauss, who was "very familiar" with the location of the accident, explained that Botey "would have been able to see all the way past the on-ramp for I-81, probably another half mile past 81, which is a good three-quarters of a mile from this inter – from this driveway." (*Id.* at 20, 42).

---

[9] Strauss obtained his Commercial Drivers' License ("CDL") in 2004 (Dep. of Strauss, at 16). At the time of his deposition in 2013, Strauss had been employed by Schneider National for nine years as a driver, as well as approximately eight years as a trainer (*id.* at 42-43). During his deposition, Strauss also stated that he was "[v]ery familiar" with the location where the accident occurred, as he had "ran dedicated out of a warehouse up there for five years" and therefore "knows that industrial park very well." (*Id.* at 20).

In light of the aforementioned testimony by Strauss, all of which was based on Strauss' personal experience, observations, and perception of what occurred both prior to, and at the time of, the collision, the Court disagrees with Plaintiff's contention that, to the extent Strauss' solitary statement in his recorded statement can even be characterized as a comment as to fault, he "lacked a sufficient factual foundation to opine as to who was at fault for the subject collision" or that his opinion regarding how the collision occurred, to the extent he even so opined on this, was not helpful to the trier of fact (Doc. 360, at 15, 16).

Finally, the portion of Strauss' recorded statement quoted by Plaintiff and at issue here was only heard by the jury twice: during Rickard's testimony and during Defendants' counsel's closing statement. (Trial Tr., June 20, 2017, at 109-110; Trial Tr., June 21, 2017, at 108). When Defendants' counsel moved for the admission of the recorded statement of Strauss, following the presentation of Strauss' deposition, Plaintiff's counsel specifically stated that he had "[n]o objection, for demonstrative purposes", further elaborating that he "ha[d] no problem with it being a demonstrative exhibit if [Defendants' counsel] wants to use it in his closing argument, certainly, that would be fine . . ." (Trial Tr., June 20, 2017, at 23-24).[10] Thus, Plaintiff waived his objection to Defendants' reference to that statement during

---

[10] Although Plaintiff did not object to the recorded statement being used "for demonstrative purposes" or as a "demonstrative exhibit", he objected to the statement "going to the jury." (Trial Tr., June 20, at 23-24). Plaintiff's inaccurate characterization of Strauss' recorded statement as a demonstrative exhibit, and objection to it "going to the jury" on the basis of his belief that it was demonstrative, results in Plaintiff having made an invalid objection. Even if this Court affords the term "demonstrative" the broadest definition, Strauss' recorded statement does not fall within the ambit of a "demonstrative exhibit" or "demonstrative evidence."

In a thorough examination by the Seventh Circuit of the term "demonstrative" as used by federal courts, the Circuit explained:

> The term "demonstrative" has been used in different ways that can be confusing. . . . In its broadest and least helpful use, the term "demonstrative" is used to describe any physical evidence. *See, e.g., Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1231 (7th Cir. 1996) (using "demonstrative evidence" as synonym for physical exhibits). When the term is used in this way, demonstrative exhibits may range from Shakespeare's version of Marc Antony's funeral oration displaying the bloody toga in *Julius Caesar,* as noted in *Finley,* to the knife in *Twelve Angry Men.* As jurors have become more visually oriented, counsel in modern trials seek to persuade them with an ever-expanding array of objects, maps, charts, displays, summaries, video reconstructions, computer simulations, and so on. *See United States v. Burt,* 495 F.3d 733, 740 (7th Cir. 2007).
>
> As Professors Wright and Miller lament, the term, "demonstrative" has grown "to engulf all the prior categories used to cover the use of objects as evidence.... As a result, courts sometimes get hopelessly confused in their analysis." 22 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5172 (2d ed.); see also 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 9:22 (3d ed.) (identifying at least three different uses and definitions of the term "demonstrative" evidence, ranging from all types of evidence, to evidence that leaves firsthand sensory impressions, to illustrative charts and summaries used to explain or interpret substantive evidence). The treatises struggle to put together a consistent definition from the multiple uses in court opinions and elsewhere. See 2 McCormick on Evidence § 212 n. 3 (Kenneth S. Broun ed., 7th ed.) (recognizing critique of its own use of "single term 'demonstrative evidence,'" noting that this approach "joins together types of evidence offered and admitted on distinctly different theories of relevance").

*Baugh ex rel. Baugh v. Cuprum S.A. de C.V.,* 730 F.3d 701, 706 (7th Cir. 2013). As the Seventh Circuit further explained, in endorsing the use of a more narrow definition of the term "demonstrative exhibits":

> As the term was used in the district court and is used in this opinion, labeling an exhibit "demonstrative" signifies that the exhibit is not itself evidence – the exhibit is instead a persuasive, pedagogical tool created and used by a party as part of the adversarial process to persuade the jury. Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of Demonstrative Evidence: Charting Its Proper Evidentiary Status,* 25 U.C. Davis L.Rev. 957, 961 (1992) ("Demonstrative proof has only a secondary or derivative function at trial: it serves only to explain or clarify other previously introduced, relevant substantive evidence."). These pedagogical devices are used to aid the jury in its understanding of the evidence that has already been admitted. "[P]edagogical charts or summaries may include witnesses' conclusions or opinions, or they may reveal inferences drawn in a way that would assist the jury. But ... in the end they are not admitted as evidence." *United States v. Janati,* 374 F.3d 263, 273 (4th Cir. 2004), citing 6 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence, § 1006.04[2] (Joseph M. McLaughlin ed., 2d ed.2003); see also *Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.,* 803 F.2d 250, 257-58 (6th Cir. 1986) (same).

When the term is used this way, demonstrative exhibits are meant to "illustrate or clarify a party's position," and they are by definition "less neutral in [their] presentation" and thus are not properly considered evidence. *United States v. Milkiewicz,* 470 F.3d 390, 396-98 (1st Cir. 2006) (internal citations omitted). They instead aim to clarify, color, or "organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence" to persuade the jury to see the evidence in a certain light favorable to the advocate's client. *United States v. Bray,* 139 F.3d 1104, 1111-12 (6th Cir. 1998), quoting *Gomez,* 803 F.2d at 257-58. Thus "[w]hen considering the admissibility of exhibits of this nature, it is critical to distinguish between charts or summaries *as evidence* and charts or summaries *as pedagogical devices." United States v. Wood,* 943 F.2d 1048, 1053 (9th Cir.1991) (internal citations and quotations omitted).

When the term is applied correctly, it allows parties and the court to avoid protracted disputes regarding the admissibility of demonstrative exhibits that might arise if such an exhibit were being offered as substantive evidence. By labeling an exhibit "demonstrative," the party using it may also gain something – some leeway to use the exhibit as an advocacy tool that the party might not enjoy if trying to admit the exhibit as substantive evidence. With this understanding of the term, the common phrase "demonstrative evidence" becomes a bit of an oxymoron. *We will not try to police the use of the phrase, but there is value to using the term more narrowly and carefully . . . so that it does not apply to an exhibit that is properly admitted as substantive evidence through the Federal Rules of Evidence.*

Offering and admitting charts, summaries, models, maps, replicas, and so on as substantive evidence rather than as "demonstrative" exhibits sends an important signal. It alerts parties to the fact that the exhibit will become part of the actual evidence and therefore may well be available to the jury during deliberation. When an exhibit is offered as substantive evidence, parties know they must make any objections they might have to the evidence at that point. Conversely, when an exhibit is allowed to be used for only demonstrative purposes, the judge and the parties understand that the exhibit is argumentative and persuasive in nature. "[S]uch pedagogical devices should be used only as a testimonial aid, and should not be admitted into evidence or otherwise be used by the jury during deliberations." *Wood,* 943 F.2d at 1053.

*Id.* at 706-708 (emphasis added).

In its broadest form, the Seventh Circuit makes clear that "demonstrative" exhibits include an "ever-expanding array of objects, maps, charts, displays, summaries, video reconstructions, computer simulations, and so on." Thus, even applying this broad definition, Strauss' recorded statement does not fall within the accepted definition of "demonstrative". Furthermore, this Court agrees with the Seventh Circuit that the more narrow definition of "demonstrative" is far more appropriate. Here, as explained several times throughout the present memorandum opinion, Strauss' recorded statement constituted relevant, substantive evidence, and was offered by Defendants and properly admitted as such. Nor was the recorded statement used to "clarify, color, or organize or aid the jury's examination of testimony or documents" but rather was a statement adopted by Strauss during his deposition, thus converting the

closing argument.[11]  With respect to Rickard's testimony wherein Strauss' recorded statement was also referenced, for the reasons discussed *infra* when addressing Plaintiff's argument that the Court erred in allowing Rickard to "reiterate" inadmissible lay opinion and hearsay statements by Strauss and Sanghera and Strauss' statement that Botey was "distracted", those statements were properly admitted under Federal Rule of Evidence 703.

### ii. Whether Strauss was qualified to offer an opinion as to the cause of the collision or who was at fault

The final subsection of Federal Rule of Evidence 701 mandates that the opinion testimony of a witness who is not testifying as an expert cannot be based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  Plaintiff once again

---

statement into an in-court, non-hearsay statement, which formed part of Strauss' testimony.  For these reasons, Plaintiff's objection to the recorded statement going to the jury on the basis that it could only be used as a demonstrative exhibit was an incorrect characterization of that evidence and did not form the basis for a proper objection.  Nonetheless, regardless of Plaintiff's misunderstanding of what constitutes "demonstrative" evidence or a "demonstrative" exhibit, for the numerous other reasons set forth in this opinion, Plaintiff's arguments with respect to why he is entitled to a new trial due to the admission of Strauss' recorded statement into evidence are without merit.

[11] "[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial." *Waldorf v. Shuta,* 142 F.3d 601, 629 (3d Cir. 1998).

> Generally, a party is not entitled to receive a new trial for objections to evidence that he did not make at or prior to the initial trial, even if they may have been successful. *Wilson v. Vermont Castings, Inc.,* 170 F.3d 391, 395 (3d Cir.1999) ("[Plaintiff] has failed to preserve this claim for appeal because [Plaintiff's] counsel did not object to Vermont Castings's cross-examination of Wilson or its closing argument."); . . . *Caisson Corp. v. Ingersoll-Rand Co.,* 622 F.2d 672, 681 (3d Cir.1980) ("[A] party may not seek a new trial on the basis of objections to evidence not brought to the court's attention at the original trial." (Citing *Belmont Industries Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434 (3d Cir. 1975)).

*Ashford v. Bartz,* 2010 WL 272009, at *4 (M.D.Pa. 2010).  An exception to this waiver rule exists "when 'counsel fail[s] to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice.'" *Wilson,* 170 F.3d at 395-396 (quoting *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 116 (3d Cir. 1992)).

relies solely on the afore-quoted portion of Strauss' recorded statement in arguing that Strauss' purported opinion as to fault requires specialized knowledge "and is not within the realm of acceptable lay witness testimony." (Doc. 360, at 17).

Plaintiff repeatedly asserts that Strauss is not an accident reconstructionist, and that he was "attempting to offer an expert opinion as to the cause of the accident by examining the crash scene and determining speed based on the damage to the vehicles and how far under the truck the Botey vehicle was following the collision." (*Id.* at 18, 19). Plaintiff has pointed to no testimony, either in Strauss' recorded statement or deposition testimony, indicating that Strauss "examin[ed]" the scene or determined speed based on the damage to the vehicles or their location following the accident. Rather, Strauss merely stated his observations of what he saw, namely that Botey's vehicle appeared not to brake or turn and was speeding, an observation he repeated during his deposition testimony wherein he stated that he heard "no horns, no brakes, sounds, nothing" and that "[i]t didn't look like [Botey's SUV] had tried to turn" (Dep. of Strauss, at 29).

Furthermore, with respect to speed, Strauss did not attempt to portray his opinion as to the speed of Botey's vehicle as anything other than his perception of what he saw. During his recorded statement, he made clear that he was making an "uneducated guess" that Botey was "over the speed limit." (Recorded Statement of Strauss, at 7). When asked during his deposition if he could estimate the speed of Botey's vehicle, Strauss again admitted that "I would be guessing if I did" and later explained that he did not know how fast Botey was

traveling because he "was never good at judging a vehicle's speed, especially that fast."
(Dep. of Strauss, at 29, 78). Strauss never opined as to the actual speed of Botey's vehicle,
other than saying that it appeared to him that Botey was going above the speed limit, an
opinion based solely on his perception.[12]

In addition, a lay witness' opinion as to speed is not necessarily based on scientific,
technical, or other specialized knowledge, and a lay person with personal knowledge may
often testify as to the speed of a vehicle. *See Sharrow v. Roy*, 2009 WL 3101031, at *5 (M.D.
Pa. 2009) ("Sharrow also argues that the opinion testimony of Roy should have been
excluded because he only had a brief period of time to estimate the speed of Sharrow's
oncoming car. Determinations of vehicular speed are traditionally the type of lay opinion
which courts have admitted into evidence. FED.R.EVID. 701; *see e.g. Bandera v. City of
Quincy,* 344 F.3d 47, 54 (1st Cir. 2003) (appropriate lay witness opinion testimony includes
'an estimate of car speed'). Even a short glance can provide a lay witness with sufficient
information to make an estimate of speed. While the short time frame could raise issues of
credibility, standing alone it does not render the lay witness opinion inappropriate."); *Houston
v. Smith,* 2010 WL 4625680 (W.D. Pa. 2010). *See also, Melgar v. Weinstein,* 2014 WL
2177891 (M.D. Pa. 2014) ("Although Defendant Sperling argues that his deposition testimony
and that of Plaintiff Melgar is 'undoubtedly inadmissible' because of its speculative nature, it
is not clear that this is the case. The Supreme Court of Pennsylvania held that the testimony

---

[12] Furthermore, as discussed in the following section, *infra*, Plaintiff has waived his objection with
respect to Strauss' testimony as to the speed of Botey's vehicle.

of a witness sitting in the front seat of a car, estimating the speed at which the car was traveling, was admissible despite the fact that the witness qualified his numerical estimate, stating it '[s]trictly as a guess.' *Finnerty v. Darby,* 391 Pa. 300, 138 A.2d 117, 122 (1958). The court clarified that the weight of the testimony was a matter for the jury and that 'absolute accuracy is not required to make a witness competent to testify to the speed of an automobile.' *Id.* at 123."); *Bradley v. O'Donghue,* 2005 WL 697466, at *3 (E.D. Pa. 2005).

For the foregoing reasons, Strauss' statements go to his personal observations and perception of the accident; they do not attempt to offer any information which could be considered scientific, technical, or otherwise specialized. Once again, whether Strauss was correct in his assertions and personal observations does not go to the admissibility of those statements, but rather to the weight of the testimony and credibility that a jury may assign to his testimony on those issues.

Plaintiff also briefly mentions Sanghera in this portion of his brief, asserting that just as with Strauss, Sanghera does "not possess any specialized knowledge or experience which would qualify [him] to offer an opinion as to the cause of the subject accident." (Doc. 360, at 17). However, Plaintiff does not elaborate on this argument with respect to Sanghera, instead focusing only on Strauss' recorded statement. Nonetheless, for reasons similar to those set forth by the Court with respect to Strauss' statements, as well as those discussed *infra* when addressing Plaintiff's arguments with respect to the lay opinion of Gurjit Sanghera, Plaintiff's argument with respect to Sanghera is without merit.

## 2. Lay Opinion Testimony of Derek Strauss regarding the Speed of Plaintiff's vehicle

Similar to his prior argument, Plaintiff next again asserts that Strauss "offered an inadmissible opinion regarding the speed of Plaintiff's vehicle." (Doc. 360, at 18). Specifically, Plaintiff relies on the following statement: "in my uneducated guess, he was not doing the speed limit, he was over the speed limit." (*Id.* (quoting Recorded Statement of Strauss, at 7)).

Although Plaintiff asserts that Strauss' statement that Botey may have been exceeding the speed limit at the time of the accident was prejudicial and should have been precluded, Plaintiff admits that "it was known and undisputed that Mr. Botey was not speeding at the time of the wreck." (Doc. 360, at 19). It is difficult, if not impossible, to understand how Strauss' statement could have caused Plaintiff to suffer prejudice when it is undisputed that Plaintiff was not exceeding the speed limit. The fact that Botey was not exceeding the speed limit at the time of the accident was clearly explained to the jury by Defendants' own expert Steven Rickard. According to Rickard, Botey's vehicle air bag module report indicated that Botey's vehicle was traveling at 42 mph at the time the air bag deployed. (Trial Tr., June 20, 2017, at 117). Moreover, Defendants' counsel, in his closing, repeatedly admitted that Botey was only going 42 mph. (*See* Trial Tr., June 21, 2017, at 109, 111, 112). Thus, the jury was well-aware of the presence of scientific evidence that Botey was not exceeding the speed limit at the time of the accident. Strauss' opinion that Botey was "not doing the speed limit", which he qualified as a "guess", was based only on

Strauss' rationally based perception of what occurred. Additionally, when later asked about Botey's speed, Strauss stated that he "would be guessing if [he] did." The fact that Strauss was incorrect when he stated that he believed Botey was not doing the speed limit does not, by itself, render his statement inadmissible. Further, the fact that Defendants' own expert's testimony contradicted Strauss' "guess", and made clear to the jury that Botey was not exceeding the speed limit, renders any purported prejudice minimal and, if anything, may have operated to damage Strauss' credibility.

Finally, Plaintiff has waived any objection with respect to Strauss' testimony as to the speed of Botey's vehicle. In Plaintiff's Motion in Limine to Preclude Inadmissible Lay Opinion Testimony (Doc. 181), Plaintiff argued that Strauss' statement that "in my uneducated guess, he was not doing the speed limit, he was over the speed limit" should be precluded because Strauss admitted that he did not know how fast Botey's vehicle was traveling and that Strauss' opinion that Botey was speeding is "mere speculation and conjecture." (Doc. 182, at 5). In its memorandum opinion addressing this motion, the Court stated:

> The Court will reserve ruling on this point. Strauss' testimony that Botey was "over the speed limit" and that the car was going "fast", is clearly rationally based on Strauss' perception and may prove helpful to the trier of fact. However, once again, the Court will need to hear the testimony by Strauss leading to these observations and opinions prior to determining whether the testimony is purely speculative.

(Doc. 288, at 6). Despite the Court reserving on the exact issue that Plaintiff now raises in this post-trial motion, at no time during trial did Plaintiff raise this argument again or request

that the Court review Strauss' deposition testimony or recorded statement to determine whether Strauss' opinions with respect to speed were speculative or rationally based on his perception of Plaintiff's vehicle. Plaintiff therefore waived any objection with respect to Strauss' testimony as to Botey's speed immediately prior to, and at the time of, the accident at issue.

### 3. Lay opinions of Gurjit Sanghera

Plaintiff next argues that, "[s]imilar[ ] to the testimony and statement of Mr. Strauss . . . , Mr. Sanghera's statements regarding fault, speed, and Mr. Botey not pushing the brake all fail to met [*sic*] each of the three requirements set forth in Federal Rule of Evidence 701." (Doc. 360, at 21).[13]

With respect to the issue of fault, Plaintiff has waived any objection thereto. Prior to trial, Plaintiff filed a motion in limine to "preclude inadmissible lay opinion testimony." (Doc. 181). As the Court explained in its memorandum opinion addressing the motion:

> Plaintiff asserts that Sanghera is not qualified to offer any opinion regarding who was at fault for the accident and thus Sanghera's statement is inadmissible because "[s]uch opinion testimony requires specialized knowledge, training, and experience and is not within the realm of acceptable lay witness testimony." (Doc. 182, at 4). . . .
>
> The Court will defer ruling on Plaintiff's request with respect to Sanghera until such time as it has heard Sanghera's testimony and has more context for the aforementioned statement. Here, Sanghera was a witness to the accident. Sanghera's opinion, based on "being a witness and seeing the accident", on

---

[13] It is worth noting that Sanghera spoke in broken, halting English with a heavy accent and his videotaped deposition was taken by lawyers for the parties on the phone, while Sanghera was in California. These factors resulted in a very poor quality, and almost incomprehensible, video deposition shown to the jury.

the issue of what occurred in the instant case is arguably rationally based on his perception and personal observations and helpful to clearly understanding his testimony and determining a fact in issue. While it is ultimately for a jury to determine whether Botey saw, or should have seen, Green's truck, if Botey could have prevented the accident in some way, and whether Green was fully negligent in his actions or if Botey contributed to, or was fully, responsible for the accident at issue, if Sanghera's opinion as to fault is supported by his personal observations and perception, his opinion will be deemed admissible.

(Doc. 288, at 3-4). In summarizing its opinion, the Court later reiterated:

For the sake of clarity, the Court will allow testimony from both Sanghera and Strauss that presents each person's account of what each saw regarding the accident in question, from the beginning of each's observation, during the time period within which the accident occurred, through the time of the actual collision of Plaintiff's and Defendant's vehicles, and thereafter.

However, for the aforementioned reasons, the Court will reserve ruling on whether Sanghera and Strauss will be precluded from offering opinion testimony as to fault for the accident at issue. . . .

(*Id.* at 9) (*See also*, Court Order, June 8, 2017, Doc. 289 ("Whether Sanghera and Strauss will be precluded from offering opinion testimony as to fault for the accident at issue is RESERVED UNTIL TIME OF TRIAL") (capitalization in original)).

In his brief, Plaintiff admits that the Court reserved ruling on the issue of Sanghera's testimony as to fault for the collision. (Doc. 360, at 20). Plaintiff does not point to any part of the trial transcript where he objected to any testimony by Sanghera *as to fault*, instead only citing to his objection during Rickard's testimony to a portion of Sanghera's recorded statement being read to the jury on the basis that it had not yet been admitted. (*See* Doc. 360, at 21) (citing Trial Tr., June 20, 2017, at 110:20-21). As discussed further, *infra*, following Plaintiff's objection on that basis, after the Court stated that it was admissible,

Plaintiff responded "[r]ight, just read it".  When opposing counsel then stated that he thought Plaintiff's counsel was objecting to Sanghera's recorded statement being read, Plaintiff's counsel responded "[g]o ahead."  (Trial Tr., June 20, 2017, at 110-111).  Therefore, having been told that the Court was reserving on the issue of whether Sanghera would be precluded from offering opinion testimony as to fault, and Plaintiff having chosen not to object at trial to Sanghera's testimony on this specific issue, Plaintiff has waived his current objection that the Court erred in allowing any statements Sanghera may have made with respect to fault for the collision at issue.  Nor can the Court find that any error occurred when Sanghera purportedly testified as to fault, and that if any error did occur, that it can be characterized as fundamental and highly prejudicial resulting in a miscarriage of justice, *see* *Wilson*, 170 F.3d at 395-396.

The Court next turns to Sanghera's testimony as to the speed of Botey's vehicle.  At trial, Plaintiff's counsel objected to the following question within Sanghera's videotaped deposition: "How fast do you believe the plaintiff's vehicle was traveling when it hit the tractor-trailer?"  (Trial Tr., June 20, 2017, at 12-14) (citing Dep. of Sanghera, at 38).  Sanghera responded: "Looked like the car driver was driving fast."  (Dep. of Sanghera, at 38).  The Court overruled the objection, agreeing with Defendants' counsel that Sanghera's response constituted lay opinion based on his rational perception and was available for cross examination.  (Trial Tr., June 20, 2017, at 14).

Preliminarily, Sanghera's statement that it "[l]ooked like the car driver was driving fast" does not, in itself, suggest that Sanghera was opining that Botey was exceeding the speed limit. It is undisputed that Botey was traveling at 42 mph when the accident occurred. Such a speed is easily characterized as "fast" while not necessarily leading to a conclusion that it was in excess of the speed limit. In addition, Sanghera's qualification that it "looked" like Botey was going fast clearly demonstrates that Sanghera was only testifying as to his rational perception of what he saw.

The Court further finds Plaintiff's argument to be without merit for reasons similar to those set forth by this Court when addressing Plaintiff's argument with respect to Strauss' opinion as to Botey's speed. In particular, it is difficult, if not impossible, to understand how Sanghera's statement that it "[l]ooked like the car driver was driving fast" could have caused Plaintiff to suffer any prejudice when it is undisputed that Plaintiff was not exceeding the speed limit – the jury was aware through Defendant's expert Rickard's testimony that Botey was going 42 mph and not exceeding the speed limit at the time of the accident. Sanghera's statement was based only on his rationally based perception of what occurred, and, once again, the fact that Defendants' own expert testimony made clear to the jury that Botey was not exceeding the speed limit, renders any purported prejudice minimal.

Plaintiff also objected at trial to Sanghera's statement that "[a]ll I see, the car didn't push a brake. . . ." (Trial Tr., June 20, 2017, at 17-19) (citing Dep. of Sanghera, at 44). Plaintiff's objection was on the basis that "[t]here's no way the guy can see what's going on

inside of Jonathan Botey's car. . ." (Trial Tr., June 20, 2017, at 17). The Court overruled

this objection, finding that the testimony "is subject to cross examination for the reasons

you've given. But it is his perception and, actually, a statement of what limits his perception,

so I think it is admissible." (*Id.*). Plaintiff has not presented any convincing argument as to

why this Court's ruling was incorrect. Although Sanghera's statement was arguably

awkwardly expressed, Plaintiff is attempting to unfairly construe Sanghera's words and

benefit from the fact that Sanghera is not a native English speaker. Sanghera's observation

that "the car didn't push a brake" is reasonably understood as an observation that he did not

see any indicia that the car attempted to slow or stop in any way. Sanghera did not need to

be inside of Botey's car to perceive that it did not appear that the car braked. Further,

Sanghera's statements immediately before and following his statement that "the car didn't

push a brake", place this observation in context and demonstrate that Sanghera was

attempting to convey his personal observations and perception of what occurred

immediately prior to the accident.[14]

Plaintiff asserts that Sanghera "lacked a sufficient factual foundation to form an

opinion as to fault, the speed of Mr. Botey's vehicle, and whether or not Mr. Botey pushed

---

[14] Immediately prior to the question which elicited Sanghera's statement that "the car didn't push the brake", Sanghera was asked: "Would it be fair to say that what you first saw or heard was that you heard the sound of the collision?". Sanghera responded: "All I see car – I was looking when he making a turn. I see the car hit the truck. . . ." (Dep. of Sanghera, at 44). Sanghera soon after explained that he could "see some traffic" and that he saw "[m]aybe two seconds the car coming up . . . ." (*Id.* at 45). Sanghera later clarified that he both heard and saw the accident. (*Id.* at 47). This testimony by Sanghera, when looked at as a whole, demonstrates that Sanghera had a sufficient factual basis for offering his perception that it did not appear that the car braked.

the brake." (Doc. 360, at 22). Plaintiff supports this by arguing that Sanghera's testimony "clearly shows that he did not see Mr. Botey or his vehicle prior to the collision." (*Id.* at 23). This misrepresents Sanghera's testimony.

Sanghera repeatedly testified during his deposition that he personally witnessed the accident that occurred on May 10, 2011. (Dep. of Sanghera, at 16, 34, 46). During direct examination, Sanghera explained that immediately prior to the accident, he saw "the back" of the tractor-trailer, saw it "completely stop" and then witnessed it make a left-hand turn onto Route 924. (*Id.* at 35-36). According to Sanghera:

> When it happen, he make a stop to making a left turn. He was halfway already left turn, like halfway L, and then the car hit the trailer where the fuel tank at. The car hit the trailer fuel tank.

(*Id.* at 36-37).

Sanghera stated that he "actually see that [the accident] and heard that." (*Id.* at 35; *see also, id.* at 47). In response to Defendants' counsel's questions, Sanghera responded that he did not hear any horns or braking sounds prior the accident. (*Id.* at 37). On cross-examination, Sanghera admitted that he "don't see whole, because the building crossing the traffic" and that he "don't see a lot of road from there on the left side", but explained that he could "see a little traffic out there." (*Id.* at 44; *see also, id.* at 45). He then stated that he saw "[m]aybe two seconds the car coming up, yeah." (*Id.* at 45).

Sanghera's deposition, when examined as a whole, demonstrates that although Sanghera admitted to only having seen Botey's vehicle for two seconds prior to the

accident, he did, contrary to Plaintiff's assertion, actually see Plaintiff's vehicle before impact. The limited time that Sanghera had to observe the vehicle, as well as any partial obstructions to his view, are issues affecting the credibility of Sanghera's testimony and the amount of weight a trier of fact decides to afford such testimony. Plaintiff had the opportunity to, and did, cross-examine Sanghera on these matters.

As a result, to the extent that Plaintiff did not waive objections to Sanghera's testimony with respect to fault and whether Plaintiff "pushed the brake", the Court finds that Sanghera's descriptions of what occurred were admissible based on Sanghera's personal observations of the events.

With respect to Sanghera's recorded statement, Plaintiff makes the following assertion:

> During the trial, Plaintiff's counsel objected to the introduction of Mr. Sanghera's recorded statement. Trial Tr., Day 7, June 20, 2017, 2017, at 110:20-21. This Court overruled Plaintiff's objection and permitted evidence of Mr. Sanghera's recorded statement to be read into the record.

(Doc. 360, at 21). Tellingly, Plaintiff does not cite to the trial transcript in support of his statement that this Court overruled his objection. Rather, Plaintiff's brief misrepresents the basis for his objection and the Court's response thereto.

During the direct examination of Rickard,[15] the following exchange took place:

**ATTORNEY CHAMBLEE**: Mr. Sanghera's recorded statement, which you reviewed, at the top.

---

[15] Defendants did not attempt to introduce Sanghera's recorded statement at the time they presented Sanghera's deposition at trial.

"QUESTION: Are you aware I'm recording the conversation?"
Do you see that?

**WITNESS**: I do, sir.

**ATTORNEY MUNLEY**: Objection, Your Honor. This one has not been admitted.

**ATTORNEY CHAMBLEE**: That is true, we haven't admitted Mr. Sanghera's statement, Mr. Strauss' is, but he [Rickard] relied upon it to formulate his opinions in this case. I'll read it instead of put it on the overhead, Your Honor.

**THE COURT**: It's admissible under Rule 702.

**ATTORNEY MUNLEY**: Right, just read it.

**ATTORNEY CHAMBLEE**: What did you say, Your Honor?

**THE COURT**: I said it's admissible under 702.[16]

**ATTORNEY CHAMBLEE**: Okay. Then we will offer Defendant's Exhibit 11, Your Honor. Oh, I thought you were objecting to it, I'm so sorry.

**ATTORNEY MUNLEY**: Go ahead

(Trial Tr., June 20, 2017, at 110-111).

The record thus reflects that Plaintiff's counsel did not, as he claims "object[ ] to the introduction of Mr. Sanghera's recorded statement", but rather to the fact that it had not yet been admitted when Defendants' counsel began reading it with Rickard. Instead, after the Court stated that it was admissible, Plaintiff responded "[r]ight, just read it" and told opposing counsel to "[g]o ahead." Plaintiff's counsel, having stated that he agreed with the

---

[16] The Court later clarified that it misspoke and was referring to Rule 703. (Trial Tr., June 21, 2017, at 34).

Court and told opposing counsel to proceed, cannot now assign error to the Court.[17]

Moreover, by agreeing with the Court and telling opposing counsel, Attorney Chamblee, to go ahead when Attorney Chamblee stated that he thought Plaintiff's counsel was objecting, Plaintiff's counsel waived his objection to the introduction of Sanghera's recorded statement and Defendants' counsel's reading of portions thereof. Where "counsel indicates begrudging acceptance of the court's ruling, there has not been a proper objection, and the ruling cannot be assigned as error on appeal." *Defenders of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 182 (D.C. Cir. 1981); *see also, Krienke v. Illinois Cent. R. Co.*, 249 F.2d 840, 845 (7th Cir. 1957) (where Defendant's counsel responded "all right" to the Court's statement that he did not have the right to make a rebuttal argument in closing statements, there was no proper objection to the ruling); *Waldorf v. Shuta,* 142 F.3d 601, 629 (3d Cir. 1998). *See also, United States v. Critton*, 43 F.3d 1089, 1097 (6th Cir. 1995) (finding that where Court sustained defendant Critton's counsel's objection to co-defendant Livingston's counsel's attempt to elicit testimony regarding an out-of-court admission by Critton and Livingston's counsel responded "Fine", "[n]either Leslie nor Janet Livingston's attorney disputed the court's ruling or offered any argument in support of the attempt to get Willie Critton's out-of-court statement before the jury. The only comment – 'Fine' – gave the

---

[17] To be clear, although certain statements in Sanghera's recorded statement were read to the jury during Rickard's testimony, Sanghera's recorded statement was never admitted or entered into evidence. (*See* Trial Tr., June 21, 2017, at 38) (Court ruling that Sanghera's recorded statement would not go to the jury).

judge no reason to reconsider his ruling and offered no grounds in support of admitting the testimony.").

For the foregoing reasons, the Court will deny Plaintiff's motion for a new trial on the basis that certain statements made by Sanghera were inadmissible.

## 4. The Recorded Statements of Strauss and Sanghera as hearsay.

Plaintiff next asserts, without a single citation to any case law in support of his position, that the recorded statements of both Strauss and Sanghera constituted "inadmissible hearsay that does not fall within any of the exceptions to hearsay." (Doc. 360, at 24). Plaintiff's basis for asserting hearsay is unclear, and Plaintiff does not specifically identify any statement within either recorded statement which he contends constitutes hearsay. Instead, without explanation, Plaintiff asserts that the recorded statements "constitute multiple hearsay." Plaintiff then argues that this hearsay is not rendered admissible by Federal Rules of Evidence 801 (c), (d) or 803(5). (Doc. 360, at 24-26). It thus appears that Plaintiff is arguing that the entirety of both recorded statements, in and of themselves, constitute hearsay.[18]

First, due to the breadth of Plaintiff's assertion and lack of any specificity as to what, within the recorded statements, constituted hearsay, it is impossible for this Court to identify

---

[18] Despite Plaintiff's generalized objection to Strauss and Sanghera's recorded statements, Plaintiff included both recorded statements in his List of Exhibits (Doc. 266) submitted to the Court on May 31, 2017. (*See also,* Doc. 337).

which statements Plaintiff contends are inadmissible hearsay with Strauss and/or Sanghera's recorded statements.

Nonetheless, the Court notes that at best, it appears that Plaintiff's argument is based on an assertion that "neither Mr. Strauss nor Mr. Sanghera's statements were originally given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition" and that Plaintiff "was not given the opportunity to cross-examine Mr. Strauss at the time the statement was made." (Doc. 360, at 26). For the reasons that follow, this argument fails – the recorded statements need not have been made under oath in order to be admissible, and Plaintiff was provided the opportunity to cross-examine both witnesses.

In relevant part, Rule 801 provides:

(d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:

(1) A Declarant-Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

(A) is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

(B) is consistent with the declarant's testimony and is offered:
(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
(ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground; or

(C) identifies a person as someone the declarant perceived earlier.

Fed. R. Evid. 801(d)(1)(A-C).

In arguing that Rule 801(d) does not apply, Plaintiff's entire argument is as follows:

It is anticipated that Defendants may argue that the statements fall within the declarant witness exclusion to hearsay. Pursuant to Rule 801 a Declarant-witness statement may not be hearsay under certain circumstances. See Fed. R. Evid. 801(d). However, none of those circumstances apply here. As an initial matter, neither Mr. Strauss nor Mr. Sanghera's statements were originally given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition. Additionally, the statements were not inconsistent with the declarant's testimony, nor were they consistent statements used to rebut a charge that the declarant fabricated it or acted from an improper influence or motive or to rehabilitate the witness's credibility.

(Doc. 360, at 25-26). Plaintiff thus offers this Court only the afore-quoted conclusory statements, which are a mere reiteration of the requirements of Federal Rule of Evidence 801(d)(1), in support of his position.

Preliminarily, Plaintiff seemingly conflates 801(d)(1)(A) and (B). Unlike subsection (A), subsection (B), which is applicable here given that, as Plaintiff admits, the recorded statements were not inconsistent with the declarants' testimony, does not contain a requirement that the prior statement must have been given under penalty of perjury. Therefore, the fact that Strauss and Sanghera's recorded statements were not originally given under penalty of perjury does not, in itself, mean that the statements are inadmissible hearsay.

Here, to the extent that Plaintiff contends that Strauss' recorded statement should not have been entered into evidence because it was not made under oath, and that Plaintiff "was not given the opportunity to cross-examine Mr. Strauss at the time the statement was made" (Doc. 360, at 26), these arguments are without merit. During Strauss' deposition,

taken under oath, Defendants' counsel showed Strauss an exhibit marked as Exhibit 1 of his deposition, which Strauss identified as "the recorded statement that I made a couple days after the accident." (Dep. of Strauss, at 18-19). Strauss agreed with Defendants' counsel that he had reviewed that recorded statement and that this recorded statement was "an accurate representation of what [he] provided for the lady taking [his] statement." (*Id.* at 19). When later asked by Plaintiff's counsel whether there was anything in his recorded statement which he disagreed with, Strauss responded that "I went through it and I did not see anything that I would want to change or disagree with." (*Id.* at 73). Plaintiff's counsel then proceeded to question Strauss with respect to several statements contained within the recorded statement. (*Id.* at 73-74).

The above sequence of events at Strauss' deposition demonstrates that Strauss, having read his recorded statement, identified it as his own, and testified under oath that he "did not see anything that [he] would want to change or disagree with". Strauss' testimony throughout his deposition also demonstrated that he had personal knowledge of the matters upon which he was questioned both during the recorded statement and in the deposition. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). For these reasons, Strauss adopted his recorded statement during his deposition and it was thus incorporated therein. Because Strauss adopted the recorded statement as his

own, that recorded statement is not hearsay. *See* Fed. R. Evid. 801 advisory committee notes (d)(1)("If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem."). *See also, Amarin Plastics, Inc. v. Maryland Cup Corp.*, 946 F.2d 147, 153 (1st Cir. 1991) ("When a witness, on the stand and under oath, acknowledges that a prior statement is his own statement and is truthful, then the witness adopts the prior statement as his present testimony and there is no hearsay problem.") (collecting cases); *United States v. Rosetta*, 127 F.3d 1110 (Table), at *1 (10th Cir. 1997) ("The advisory committee note to Fed. R. Evid. 801(d)(1) explains: 'If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem.' Because the adopted statement is not hearsay, it is substantive evidence and need not be limited to impeachment or rehabilitation of the witness. Adoption of prior statements by a witness will make the statements a part of the witness' present testimony.") (internal quotation marks omitted); *BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil,* 184 F.R.D. 3, 6 (D.D.C. 1999) (finding that the Fed. R. Evid. 801(d)(1) advisory committee's note "is in keeping with a number of decisions recognizing adopted or incorporated statements as non-hearsay" and explaining that "a witness's reference to the prior statement need not be so specific as to require each and every question of a prior deposition or every sentence of a prior statement to be reiterated by the witness during testimony.").

Here, not only did Strauss adopt the recorded statement, he demonstrated personal knowledge of the events upon which he was questioned, and Plaintiff's counsel was provided an opportunity to cross-examine Strauss as to the contents of the recorded statement, and did so. Strauss' statements during his deposition both in response to Plaintiff's counsel and Defendants' counsel affirming that this recorded statement was accurate and that he would not change or disagree with any of its contents, resulted in an adoption of the recorded statement, thus making the substance of the recorded statement part of the witness's in-court, non-hearsay testimony and admissible as substantive evidence. This renders the recorded statement outside the ambit of hearsay. The fact that Plaintiff chose not to cross-examine Strauss about certain statements to which he now objects is immaterial – counsel was given the opportunity to ask any questions regarding the document and made a decision as to what statements he wanted to address with Strauss. The Court cannot now be held accountable for Plaintiff's choice of questioning during Strauss' deposition.[19]

Even if the Court were to find that Strauss' recorded statement was hearsay, contrary to Plaintiff's conclusory assertion, it was admissible under Rule 801(d)(1)(B)(i), *i.e.*

---

[19] It must be noted that Plaintiff never objected at trial to the introduction of Strauss' recorded statement on the basis of hearsay. Instead, as previously explained, following the conclusion of Strauss' videotaped deposition, the defendants moved for the admission of the recorded statement of Strauss, at which time Plaintiff stated, "[n]o objection, for demonstrative purposes," but objected to the recorded statement going back with the jury on the basis, broadly construed, that the statement was not properly authenticated. (Trial Tr., June 20, 2017, at 23-24). While this Court has found that Strauss' recorded statement was both properly authenticated and was adopted such that it was not hearsay, Plaintiff's only objection to the admissibility of Strauss' statement lacked the necessary specificity to bring to the Court's attention, or fully apprise the Court of, any possible hearsay issue.

"to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."

During Strauss' videotaped deposition shown to the jury, the following exchange occurred between Plaintiff's counsel – Attorney Munley – and Strauss:

Q. Okay. You testified earlier -- I just want to -- just a couple follow-ups, then I think I'm finished.

A. Okay.

Q. -- that you never spoke to either the office about -- or let me just start that over. Let me start that question over.

A. Okay.

Q. You testified earlier that you did contact [Defendants' counsel's] office when you got the subpoena, is that right, to come and testify here?

A. I don't remember the exact sequence of the events, but it was something to the effect of – I believe this subpoena was delivered to my house.

Q. Okay.

A. I don't remember who signed for it. I wasn't home.

Q. Okay.

A. I was out on the road. When that was received, I believe I called to get information –

Q. Okay.

A. -- what this was about, and there was several conversations about scheduling this deposition.

Q. Right.

**A**. Until we get to where we are now.

**Q**. Okay. Did you talk about what you were going to say?

**A**. No.

**Q**. Anybody show you any photographs, or anything?

**A**. No. The first –

**Q**. No?

**A**. The first photographs I've seen, other than the ones that I took, are here.

**Q**. Okay.

**A**. And I don't even have the ones I took anymore.

**Q**. Who did you speak to at the firm? You mentioned a paralegal.

**A**. Yeah. I could probably look through these and find her name, give you the exact name of the person.

**MR. BRODY**: Let me expedite the process. It was Debbie McCallin, my paralegal.

**MR. MUNLEY**: Okay.

**THE WITNESS**: He's faster.

**MR. MUNLEY**: I understand. That's probably -- the letter is probably from -- well, maybe it was from the lawyer, but it says contact Debbie.

**BY MR. MUNLEY**:
**Q**. But did you speak to any of the lawyers at any of the times that you contacted the firm?

**A**. There was the one, maybe twice with you [Mr. Brody], correct, sir? And again, it was just about scheduling.

**Q**. Did you have conversations with them at any point in time about anything else?

**A**. No. Other than just trying to get here to do this.

**Q**. Okay. Well, I -- I should ask you because you did say that when I sent you a request.

**A**. Correct, yes. I had -- let me backtrack. There was --

**Q**. -- that you contacted the firm?

**A**. It was one of the last conversations that you -- with Debbie, with Debbie, one of the last conversations I had with Debbie, which was before I got this most recent letter from your firm, I had asked her about the DMV request.

**Q**. Okay.

**A**. And she said, let me get back to you on that, and I guess she spoke with you or one of the others, and they said, hold off, just bring it here.

**Q**. Why didn't you call me?

**A**. To be honest –

**Q**. I'm the one who sent you the letter.

**A**. To be honest, I don't know, sir, why I didn't call you.

**Q**. My name is on the letter, right?

**A**. Yes.

**Q**. My phone number?

**A**. Your firm is, yes. I don't know why I didn't call you.

**Q**. I mean, you don't dispute that you got it, right?

**A**. I didn't even bring it up until when the paralegal called me. I didn't bring it up with anybody. I'm out on the road. I didn't even have this in my hand. I just had it from my wife, you got something requesting your DMV, and I said don't do anything with it.

**Q**. Okay. But you didn't contact me though; am I --

**A**. I didn't contact anybody until I had that conversation with his paralegal.

**Q**. Until FFE's lawyer called you?

**A**. The paralegal, yes.

**Q**. And then you asked FFE's lawyer if you had to comply, I take it?

**A**. I asked something to the effect of what is this for, why, I don't know, I don't understand.

**Q**. Okay. And they told you to disregard it?

**A**. No. They said something to the effect of bring it here.

**Q**. Okay.

**A**. I don't remember --

**Q**. Well, I'm going to ask you to sign it now then. Okay?

**A**. I don't remember -- can I ask why, sir? I'm just curious why you need my DMV.

**Q**. No.

(Dep. of Strauss, at 79-84).

As previously stated, a prior statement by a witness may be admissible under Rule 801(d)(1)(B)(i) "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."

> The Supreme Court has said that four requirements must be met in order for prior consistent statements to be admitted into evidence under Rule 801(d)(1)(B): (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995); *United States v. Collicott,* 92 F.3d 973, 979 (9th Cir. 1996).

*United States v. Frazier*, 469 F.3d 85, 88 (3d Cir. 2006).  "Evidence admitted under rule 801(d)(1)(B), while conditioned upon the need to rebut a charge of fabrication, may be used by the jury for any substantive purpose to establish the truth of what it says. Fed. R. Evid. 801(d)(1)(B), Advisory Comm. Note."  *United States v. Provenzano*, 620 F.2d 985, 1002 n.21 (3d Cir. 1980).

However, "[p]rior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited."  *Tome,* 513 U.S. at 157.  Rather, the Rule serves to allow a party to "rebut[ ] an alleged motive, not bolster[ ] the veracity of the story told."  *Id.* at 158.  "The line between challenging credibility or memory and alleging conscious alteration can be drawn when a district court determines whether the cross-examiner's questions reasonably imply intent on the part of the witness to fabricate."  *Frazier*, 469 F.3d at 89.

Here, Strauss' video deposition was presented at trial and Plaintiff's counsel was provided the opportunity to cross-examine Strauss during the deposition, including asking any questions regarding the recorded statement that he so chose.  Further, the contents of

Strauss' recorded statement are generally consistent with Strauss' deposition testimony shown at trial, nor does Plaintiff argue otherwise. *See e.g., United States v. Muhammad,* 512 F.App'x 154, 165-166 (3d Cir. 2013) ("It follows that the rule [801(d)(1)(B)] allows the 'use of earlier statements that are *generally consistent* with the testimony at trial.' *United States v. Casoni,* 950 F.2d 893, 904 (3d Cir. 1991)*; see also United States v. Vest,* 842 F.2d 1319, 1329 (1st Cir. 1988) ('[A] prior consistent statement need not be identical in every detail to the declarant's . . . testimony at trial. . . .')"). Thus, the first and third factors of *Tome*, set forth by the Third Circuit in *Frazier*, are met.

The *Tome* second and fourth factors have also been satisfied. As demonstrated by the afore-quoted exchange between Plaintiff's counsel and Strauss during Strauss' deposition, Plaintiff's counsel attempted to impugn Strauss' testimony by suggesting to the jury that Strauss was working with Defendants' counsel, obtained legal advice from Defendants' counsel, and that Strauss' deposition testimony may have been improperly influenced by the defendants through one or more conversations Strauss had with Defendants' counsel and counsel's office staff. Plaintiff's counsel further attempted to imply an improper motive or influence on the part of Strauss by repeatedly asking why Strauss did not contact Plaintiff's counsel's office, and instead only communicated with Defendants' law firm. Here, Strauss' recorded statement was made only a week after the accident at issue in this action. Each of Plaintiff's counsel's questions with respect to Strauss' communications with Defendants' counsel about the subpoena and Plaintiff's DMV request

addressed events and conversations which occurred approximately two years after Strauss

provided the recorded statement, and thus "prior to the time that the supposed motive to

falsify arose."

For the aforementioned reasons, although Strauss' recorded statement did not

constitute hearsay because it was adopted by Strauss during his deposition, even assuming

*arguendo* that it was not adopted, Plaintiff's counsel's questions during Strauss' deposition

reasonably implied intent on the part of Strauss to fabricate, and Strauss' recorded

statement was therefore properly admitted pursuant to Rule 801(d)(1)(B)(i) "to rebut an

express or implied charge that the declarant recently fabricated it or acted from a recent

improper influence or motive in so testifying."

The Court will next address the recorded statement of Sanghera. Sanghera's

recorded statement was never admitted into evidence. (*See* Trial Tr., June 21, 2017, at 38)

(Court finding Sanghera's recorded statement would not be admitted into evidence and

would not be sent to the jury). Rather, only a small portion of the recorded statement was

read to the jury during the testimony of Rickard. For the reasons discussed, *infra*, this was

entirely permissible under Rule 703 in that Sanghera's limited statements were of the type

that an accident reconstructionist such as Steven Rickard would reasonably rely on in

forming an opinion on the subject. Furthermore, once again the Court notes that at the time

that certain statements by Sanghera were read during Rickard's testimony, Plaintiff failed to

object to these portions of Sanghera's recorded statement being read to the jury on any

basis, including hearsay, instead instructing Defendants' counsel to "just read it" and "[g]o ahead" when counsel was reading these portions of Sanghera's recorded statement with Rickard. The issue of the admissibility of those statements by Sanghera on the basis of hearsay has been waived.[20]

Finally, Plaintiff's motion for a new trial on the basis that "the inadmissible hearsay and lay opinions contained within the prior recorded statement of Derek Strauss and Gurjit Sanghera influenced the jury in making the determination that Defendant Green was not negligent" (Doc. 360, at 26), has also been waived as Plaintiff failed to object to Strauss or Sanghera's recorded statements on the basis asserted in this motion now before the Court, *i.e.*, hearsay.

As previously explained, *supra* at n. 11, "a party who fails to object to errors at trial waives the right to complain about them following trial." *Waldorf,* 142 F.3d at 629. An exception to this waiver rule exists "when 'counsel fail[s] to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice.'" *Wilson*, 170 F.3d at 395-396 (quoting *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 116 (3d Cir. 1992)). Here, even if the Court were to accept Plaintiff's assertion that the recorded statements constituted hearsay, Plaintiff has failed to demonstrate or explain how these statements impermissibly influenced the jury. Plaintiff was not so unduly prejudiced by the brief portions of

---

[20] Regardless of whether Sanghera's statements which were read to the jury during Rickard's testimony were given under oath, Plaintiff had every opportunity to cross-examine Sanghera about these statements during his deposition. During Sanghera's deposition, Attorney Wenzel, an attorney at Plaintiff's law firm, provided Sanghera with a copy of his recorded statement and asked him several questions relating to that statement. (*See e.g.,* Dep. of Sanghera, at 42-43, 49-50).

Sanghera's recorded statement read to the jury or the admission of Strauss' recorded statement into evidence so as to effect a miscarriage of justice. When considered in light of the other evidence presented at trial, including Strauss and Sanghera's deposition testimony which, as Plaintiff admits "were not inconsistent" with the recorded statements (Doc. 360, at 26), neither recorded statement, or portion thereof, can be considered "highly prejudicial" or likely to cause "a miscarriage of justice."

For these reasons, Plaintiff's motion for a new trial on the basis that the recorded statements of Strauss and Sanghera are inadmissible hearsay and should have been precluded will be denied.

## 5. Defendants' expert Steven Rickard's "reiteration" of Strauss and Sanghera's statements

On June 20, 2017, the seventh day of trial, Defendants called Steven Rickard who explained that he was there to "talk about the cause of the accident and the physical evidence that surrounds the accident and certain speeds of vehicles and components of the accident that w[ould] permit [him] to render an opinion" (Trial Tr., June 20, 2017, at 86). Following a description by Rickard of his over 45 years of experience which led him to develop his "specialty . . . [in] the reconstruction of accidents involving commercial motor vehicles", Rickard was admitted as an "expert in accident investigation and reconstruction" without objection by Plaintiff's counsel. (*Id.* at 86-95).

Plaintiff asserts that Rickard was "impermissibly permitted to reiterate the inadmissible lay opinion and hearsay statements" of Strauss and Sanghera. (Doc. 360, at

27). In support of his position, Plaintiff directs the Court to two portions of Rickard's direct examination at trial, both related to Strauss and Sanghera's recorded statements.

Plaintiff first cites to the following exchange:

Q. Okay. Question at the top of Derek Strauss' [recorded] statement.
"QUESTION: Did you see that vehicle, the driver taking any evasive action, like trying to turn away, you know, away from the truck or –"
What's the answer Mr. Derek Strauss gave in a recorded statement after the accident?

A. "ANSWER: No, it looked like he was just going for gold."

Q. "QUESTION: Yeah."
Read the answer.

A. "ANSWER: Just straight in."

Q. Down below the question.
"QUESTION: In your opinion, you know, as witnessing the accident, did you have any opinion on whose fault the accident was or what happened?"
And Mr. Strauss' answer, in his recorded statement after the accident, the witness to the accident;
"ANSWER: It would truly be my opinion in what I think happened was the driver of the Bravada was distracted in some way."
Do you see that?

A. I do, sir.

Q. Who is the driver of the Bravada?

A. Mr. Botey.

Q. The rest of his answer.
"ANSWER: Because there was, as I said, no attempt to brake, no attempt to turn, and in my estimated guess, he was not doing the speed limit."
Do you see that?

A. I do, sir.

**Q**. So when you reviewed the gestalt or the impression of the recorded statement of one of only two witnesses to this accident, whose fault does he, from his gestalt, his perception, his view, believed this accident belonged to?

**A**. Mr. Botey.

**Q**. Is the same true in the recorded statement of Mr. Sanghera that you reviewed, which was taken, also, after the accident and before his depo?

**A**. Yes, sir.

(Doc. 360, at 28-29) (quoting Trial Tr., June 20, 2017, at 109-110).

Plaintiff also cites to the following exchange:

**Q**. Then it is admitted, Defendant's Exhibit 11, the recorded statement of Sanghera,[21] shortly after the accident. This is the only other witness to the accident. In his recorded statement taken shortly after the accident, he was asked his perception, his viewpoint, what he thought, what he saw. Here's the question.
"QUESTION: And in your opinion, you know, from being a witness and seeing this accident, whose fault would you think the accident was?"
And Mr. Sanghera says:
"ANSWER: I've been driving from 2004. I've been driving trucks. All I can say is it's the car driver's fault, because even, even let's say even truck driver, he didn't see him, even if he didn't see him, but the car driver did see the big truck, the big truck coming through the road, you know, coming to that building, why he not stop?"
Do you -- I'm going to read the rest of it -- do you, as the accident reconstructionist, have any logical or reasonable or possible explanation for why Mr. Botey that day -- and we're going to talk about timing and distance -- did not stop?

**A**. I think, in the critical seconds leading up to the occurrence of the accident, he was inattentive and driving carelessly.

---

[21] Although Defendants' counsel stated here that Sanghera's recorded statement "was admitted", the recorded statement was not admitted into evidence or provided to the jury during deliberations. (*See* Trial Tr., June 21, 2017, at 38).

**Q**. Let's see if your viewpoint as an accident reconstructionist matches that of the witness.

"ANSWER: Right, because it's pretty straight road there that you think he would have saw the truck was already making the -- going to make the right turn. Yeah, if big thing come in front of you and you not see it, you can't miss it."

"QUESTION: Okay."

And the answer;

"ANSWER: No way. So that's the car driver's fault."

Do you see that?

**A**. I do.

**Q**. So we have two witnesses to the accident. You said, in this courtroom today, do either witnesses -- are they beholding [*sic*] to either Mr. Botey or to this side of the room, from what you heard?

**A**. No, sir.

**Q**. And both of these witnesses, the only two to the accident, in their recorded statements that they gave shortly after the wreck, they described their perception, their gestalt, their feeling, their viewpoint is it is Mr. Botey's fault completely. Don't they?

**A**. They do.

**Q**. Does your accident reconstruction investigation, after you started applying some science and some analysis to this, support the viewpoints of the two witnesses to the accident?

**A**. Absolutely.

(*Id.* at 29-30) (quoting Trial Tr., June 20, 2017, at 111-113).

Preliminarily, once again, for reasons previously discussed, Plaintiff has waived any objection to Rickard's testimony wherein portions of Sanghera's recorded statement were referenced or read to the jury. Although Plaintiff asserts that "[d]uring the trial testimony of

Mr. Rickard, Plaintiff's counsel objected to Mr. Rickard's testimony regarding Mr. Sanghera's recorded statement" (Doc. 360, at 27), as already explained several times, Plaintiff's objection with respect to this testimony was that Sanghera's recorded statement had not yet been admitted when Defendants' counsel began reading it with Rickard. Instead, after the Court stated that it was admissible, Plaintiff responded "[r]ight, *just read it*" and told opposing counsel to "[g]o ahead" after Defendants' counsel stated that he "thought you were objecting to it" (*see* Trial Tr., June 20, 2017, at 110-111) (emphasis added). This acceptance and agreement with the Court, and counsel's specific statement to Defendants' counsel to "read it", demonstrates a clear waiver of Plaintiff's current objection that portions of Sanghera's recorded statement should not have been read during Rickard's testimony. *See Defenders of Wildlife, Inc.*, 659 F.2d at 182; *Krienke,* 249 F.2d at 845; *Waldorf,* 142 F.3d at 629; *Critton*, 43 F.3d at 1097. Furthermore, while Plaintiff filed a motion in limine (Doc. 193) to preclude Rickard from "reciting Mr. Strauss' conclusions regarding how the subject accident occurred and who he determined to be at fault" (Doc. 194, at 4), Plaintiff's motion was specifically directed at precluding any mention of Strauss' statements by Rickard; it did not mention or reference Sanghera's expected testimony or his recorded statement. Thus, to the extent that Plaintiff now argues that his motion in limine somehow preserved this issue and the Court erred in allowing Rickard to "reiterate" a portion of Sanghera's recorded statement, such objection has no merit.

Plaintiff's argument that the Court "erred in permitting Defendants to circumvent the rules of evidence by offering otherwise inadmissible evidence during the testimony of its expert Steven Rickard under the guise of Federal Rule of Evidence 703" (Doc. 360, at 28) is equally without merit.

Pursuant to Rule 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Under this rule, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "[A]n expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. . . . [I]n appropriate cases, [modern practice] permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts." *Williams v. Illinois*, 567 U.S. 50, 57, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (plurality). Nonetheless, "[t]o the extent that [the expert's] opinions were predicated upon factual assumptions . . . those assumptions 'must find some support in the record.'" *Shaw*

by *Strain v. Stackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (quoting *Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn.*, 745 F.2d 248, 262 (3d Cir.1984)). "[Federal] Rule [of Evidence] 705,[22] together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

When asked by Defendants' counsel what he relied on in arriving at his opinions, Rickard stated that he reviewed the following documents: (1) the Pennsylvania State Police accident report written by Trooper Nelepa; (2) the "recorded statements from Mr. Botey, Derek Strauss and . . . Sanghera"; (3) Botey, Strauss, and Nelepa's depositions; (4) the Hazle Township fire and rescue report; (5) the air bag module report; (6) the expert reports of Plaintiff's experts Morgan and O'Connor; and (7) photographs of the accident scene. (Trial Tr., June 20, 2017, at 100-106). Rickard also testified that he "went to the accident scene two days after the accident" and took photographs of the scene. (*Id.* at 100).[23]

---

[22] Pursuant to Federal Rule of Evidence 705:

Unless the court orders otherwise, an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.

Fed. R. Evid. 705.

[23] Although Plaintiff appears to assert in part that Rickard's testimony was not the result of the type of information upon which an accident reconstructionist would typically rely, this assertion is without any factual or evidentiary support and is clearly belied by the record, wherein Rickard testified as to the many documents, photographs, and personal perceptions and recordings which formed the basis for his opinions as listed here.

At trial, Rickard answered in the affirmative when asked by defense counsel whether he "formulate[d] an opinion, from a review of everything [he] did, applying [his] education and [his] training, as to cause and whose fault the accident was in question[.]" (*Id.* at 114). Based upon his review, education, and training, Rickard testified that his opinion was that:

> . . . in the critical seconds leading up to the occurrence of this accident, Mr. Botey was inattentive and/or careless for failing to see a 70-foot long tractor-trailer directly in front of him, occupying both travel lanes. This was not a dart-out accident. He had more than sufficient time, distance and opportunity to perceive and respond in a number of safe ways to avoid becoming involved in the accident.
> He could have simply taken his foot off the accelerator, but the air bag module report indicates that he did not do that.

(*Id.* at 114-115).

Rickard supported this testimony by explaining that upon review of the air bag module report, he could determine that Botey was traveling at 42 mph at time of impact, that Botey's vehicle did not decelerate in the moments before the crash and that there was no indication that Botey applied his brakes (Trial Tr., June 20, 2017, at 115, 117-119). Rickard further opined that Botey had "[m]ore than sufficient time" to stop prior to hitting Green's tractor-trailer (*id.* at 120) and therefore Botey was at fault (*id.; see also, id.* at 125, 133). In support of this opinion, Rickard explained that perception and reaction time is approximately 1.6 seconds to "turn away" and 2.2 seconds "when the response of the driver is to brake." (*Id.* at 121). Rickard had previously explained that it takes approximately 8.7-10.3 seconds for a tractor-trailer rig to make left hand turn from a stop to get to the point where Green was

located at time of the accident (*id.* at 115-116, 159), and later noted that Green's tractor-trailer had moved 75-100 feet before being struck (*id.* at 138, 160).

Here, Rickard did not vouch for the accuracy of Strauss or Sanghera's statements – he merely stated that based on his analysis of the scene, the other evidence he reviewed including several reports and photographs, and his own expertise and training, his findings were consistent with, or supported by, the two witnesses' statements. To the extent that Plaintiff is asserting that Rickard's opinions were in part predicated upon statements or observations by Strauss and/or Sanghera, those statements and observations were clearly supported by other evidence of record. At the end of defense counsel's discussion with Rickard about Strauss and Sanghera's recorded statements, the following exchange, which is included within the portion of Rickard's testimony to which Plaintiff now objects, occurred:

> **Q**. Does your accident reconstruction investigation, *after you started applying some science and some analysis to this*, support the viewpoints of the two witnesses to the accident?
>
> **A**. Absolutely.

(Trial Tr., June 20, 2017, at 113) (emphasis added). This exchange demonstrates that although Rickard read and considered the statements of the two eyewitnesses, he did not blindly adopt their opinions or perceptions. Rather, Rickard used his experience and scientific, technical, and specialized knowledge and training in determining what occurred,

and his testimony makes clear that his findings merely confirm certain statements made by

Strauss and Sanghera.[24]

---

[24] For example, the following two exchanges between Defendants' counsel and Rickard demonstrate that while portions of Strauss and Sanghera's recorded statements read during Rickard's testimony support Rickard's independent analysis findings, those statements did not form the basis for Rickard's expert opinion.

Q. So 42 miles an hour to impact. Did that ECM data, downloaded off his vehicle at impact, tell us whether or not he decelerated or ever applied his brakes?

A. Indicated he did not apply his brakes.

Q. Did not. All right, so when Sanghera and Strauss testified, from their own personal perceptions, that he didn't look like he slowed down and he didn't look like he applied his brakes, they're just saying that's kind of sort of what I thought and what I saw, and when we pulled the data, lo and behold, it's exactly what they saw?

A. Supported their testimony, correct.

(Trial Tr., June 20, 2017, at 117-118).

Q. But if we put Mr. Botey in the roadway, and following accident reconstruction principles and analysis, in this particular case, and he's in the roadway when we make this decision, under your accident reconstruction analysis, this accident is the fault of whom?

A. Mr. Botey.

Q. Does your opinion, in any way, disagree with the two eyewitnesses to this accident?

A. Seems to support one another.

Q. Yes. And when we try to verify what they said by pulling ECM data on no braking and all that, their thoughts that they had, at that point, when they gave a statement, were fully supportive of the data we pulled?

A. They were.

(Trial Tr., June 20, 2017, at 125).

With respect to Strauss, excluding the statements of Rickard and defense counsel, the portion of Strauss' recorded statement read to the jury to which Plaintiff now objects is as follows:

> "QUESTION: Did you see that vehicle, the driver taking any evasive action, like trying to turn away, you know, away from the truck or –"
>
> "ANSWER: No, it looked like he was just going for gold."
>
> "QUESTION: Yeah."
>
> "ANSWER: Just straight in."
>
> "QUESTION: In your opinion, you know, as witnessing the accident, did you have any opinion on whose fault the accident was or what happened?"
>
> "ANSWER: It would truly be my opinion in what I think happened was the driver of the Bravada was distracted in some way."
> .
> "ANSWER: Because there was, as I said, no attempt to brake, no attempt to turn, and in my estimated guess, he was not doing the speed limit."

Strauss' statements that Botey was going "[j]ust straight in", and that there was "no attempt to brake, no attempt to turn, and in my estimated guess, he was not doing the speed limit", are all based on Strauss' personal observations of the accident and highly probative to the jury understanding what occurred on the day in question. Further, with respect to Strauss' statement that Botey "was distracted in some way", as previously explained by the Court when addressing Plaintiff's motion in limine to preclude inadmissible lay opinion testimony:

> Strauss, who testified that he witnessed the accident, does not actually opine as to fault. Rather, he states his observations of what he saw, namely that

Botey appeared "distracted in some way", did not attempt to brake or turn, and was speeding. Furthermore, Strauss' statement goes to his personal observations and perception of the accident; it does not attempt to offer any information which could be considered scientific, technical, or otherwise specialized. Although Plaintiff's objection to Strauss' opinion appears to largely be based on Strauss' statement that Botey was "distracted in some way", whether a person is distracted is well-within a lay observer's ability to perceive; it does not require any specialized knowledge or training. Thus, whether Strauss is correct in his assertions and personal observations does not go to the admissibility of his statements, but rather to the weight and credibility of his testimony on those issues, which can be questioned during cross-examination. . . .

(Doc. 288, at 5).

For the reasons set forth earlier in this opinion, as well as those explained in this Court's opinion addressing Plaintiff's motion *in limine*, each statement by Strauss read during Rickard's testimony was admissible. Strauss' statements are based on his personal observations and perceptions of what occurred immediately prior to, and at the time of, the accident, and were adopted by Strauss during his deposition testimony. The requirement in Rule 703 permitting the disclosure of facts relied upon by the opining expert only if their probative value in helping the jury evaluate the expert's opinion substantially outweighs the prejudicial effect of those facts has application only where the facts relied upon by the expert are inadmissible, a circumstance not present here with respect to Strauss'

statements, as explained herein. And clearly, Strauss' statements are of the kind of facts or data which an expert such as Rickard would reasonably rely upon in forming his opinion.[25]

Furthermore, Plaintiff's assertion that the statements of Strauss and Sanghera "regarding who was at fault for the subject collision and the speculative opinion that Mr. Botey was distracted should have been precluded as the probative value of such 'facts' does not substantially outweigh its prejudicial effect" (Doc. 360, at 32) is without factual or legal support. As explained, *supra*, Strauss' statements were admissible under Rule 701 and were adopted during his deposition. As explained immediately above, this renders the requirement under 703 that Plaintiff relies upon in support of his argument, i.e., that "the proponent of the opinion may disclose [otherwise inadmissible facts or data] to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect", inapplicable. Additionally, for the reasons explained at length in this opinion, Strauss did not testify as to fault. Even if he had, Plaintiff has waived any objection to that portion of Strauss' recorded statement during Rickard's testimony. In ruling on Plaintiff's motion *in limine* to preclude inadmissible lay opinion testimony (Doc. 181), the Court made clear that "[t]o the extent that Defendants attempt to elicit a specific opinion by Strauss as to fault, the Court will reserve ruling on Plaintiff's motion to preclude such an opinion until trial, at which time Plaintiff is expected to make a timely objection." (Doc. 288,

---

[25] Because any objection to portions of Sanghera's recorded statement being read to the jury has been waived, the Court declines to address each of Sanghera's specific statements to which Plaintiff now complains.

at 5).  Plaintiff's counsel never objected on any basis during Rickard's testimony to Strauss'
statements being read to the jury, including that Defendants were purportedly inadmissibly
attempting to introduce Strauss' opinion as to fault.[26]

Even assuming the specific statements to which Plaintiff now objects were
inadmissible, their probative value in helping the jury evaluate Rickard's opinion
substantially outweighs their prejudicial effect, as mandated by Rule 703.  The statements
read to the jury related directly to the moments immediately preceding the accident, were
highly probative to understanding what occurred on that day, and significantly aided the jury
in better comprehending the facts and circumstances surrounding the events at issue.  The
statements read during Rickard's testimony reflected Strauss and Sanghera's personal
observations and perceptions of what occurred at the time of the accident and were properly
taken into consideration by Rickard in arriving at his opinion that Botey was "inattentive
and/or careless for failing to see a 70-foot long tractor-trailer directly in front of him,
occupying both travel lanes" and that Botey had "more than sufficient time, distance and
opportunity to perceive and respond in a number of safe ways to avoid becoming involved in
the accident."  (Trial Tr., June 20, 2017, at 114-115).  The statements read to the jury further

---

[26] Nor does Plaintiff's Motion in Limine "to preclude the testimony and opinion of Defendants'
expert Steven W. Rickard" (Doc. 193) preserve this objection.  Although Plaintiff's brief in support of the
objection broadly suggests that "Mr. Rickard must be precluded from reciting Mr. Strauss' conclusions
regarding how the subject accident occurred and who he determined to be at fault" (Doc. 194, at 4), it
focuses only on precluding Strauss' statement that he believed Botey was "distracted in some way."  (*See
generally*, Doc. 194).  The Court denied Plaintiff's motion on the basis that because Strauss could testify
that Botey appeared "distracted", it was not impermissible for Rickard to reiterate *that opinion*.  (*See* Doc.
289).  The Court in no way ruled that any testimony by Strauss regarding fault could be read during
Rickard's testimony.

aided the jury in understanding one, of many, pieces of evidence that Rickard reviewed in coming to his final conclusions.  If there had been any prejudicial effect from Strauss and/or Sanghera's statements, it would have been minimal as the jury was already aware of the eyewitnesses' prior testimony, including their qualifications as tractor-truck drivers and their personal observations on the day of the accident, and, in addition, because Rickard came to similar conclusions as both eyewitnesses based on his own independent analysis of the evidence surrounding the accident.

For the foregoing reasons, Plaintiff's motion for a new trial on the basis that Rickard impermissibly reiterated certain statements by Strauss and Sanghera will be denied.

### C. Allowing the Videotaped Deposition Testimony of Derek Strauss

Plaintiff's next basis for a new trial further focuses on Strauss' testimony, arguing that the Court impermissibly allowed the Defendants to present Strauss' videotaped deposition testimony at trial.

To fully evaluate Plaintiff's argument, the background leading to the Court's decision must be set forth.

On the fifth day of trial, a Friday, the Court excused the jury at "about 12:18" with directions to return by 1:00 p.m.  (Trial Tr., June 16, 2017, at 128-129).  At that time, counsel for Defendants, William Chamblee, brought a "scheduling issue" to the Court's attention.  (*Id.* at 129).  Attorney Chamblee explained that Strauss was under subpoena, had been available all week, but was scheduled to leave for a multi-week long trucking trip

for work that day. (*Id.*).[27]  Pursuant to a conversation with Plaintiff's counsel, Defendants' counsel stated that he and his co-counsel were under the impression that, although Plaintiff's counsel would not agree to take Strauss out-of-order, he had agreed earlier in the week that Defendants could put on Strauss by deposition during the Defendants' presentation of their case.  (*Id.* at 129-130, *see also, id.* at 132).  On Friday, Defendants' counsel was made aware that Plaintiff's counsel would no longer agree to allow Defendants to present Strauss' videotaped deposition previously taken, and therefore Defendants' counsel located Strauss and told him to come to the Courthouse.  According to Attorney Chamblee, Strauss was expected to arrive at court by 1:00 p.m.

As a result of the above events, Attorney Chamblee explained:

[T]he scheduling issue is this. Either I need to put Mr. Strauss on out of order today, when we get back, so I can put on one of the witnesses. Or two, Your Honor is going to have to instruct Mr. Strauss that he's under subpoena and he can't leave out of town for his scheduled job and has to come back Monday. Or three, we need to be able to put him on by his deposition next week.

 (Trial Tr., June 16, 2017, at 130).

When the Court asked Plaintiff's counsel for their position, Plaintiff's counsel responded with a myriad of excuses and stated that "We're not putting him on the stand in the *middle* of our case."  (*Id.* at 132)(emphasis added).

In light of the circumstances, Attorney Chamblee made the following request,

---

[27] Although Defendants' counsel originally represented that Strauss' over-the-road trucking trip was expected to take a week, Defendants' paralegal clarified for the Court that, having spoken with Strauss, the trip would "take[] two to three weeks."  (Trial Tr., June 16, 2017, at 129-131).

> My request, Your Honor, would be to declare him to be unavailable under the
> Federal rules, and that we put him on by his video deposition next week, and
> both parties can submit -- we'll just play the whole thing from start to finish.
> If there's something we need to edit out of it, that's fine, I'm not saying parties
> can't make objections, if we edit it, but we put him on by video. I think that's
> the best solution.

(*Id.* at 135).  The Court thereafter granted this request.  (*Id.*).

After the lunch break, Plaintiff proceeded to put one witness on the stand and then,
with no prior notice, rested his case at 2:00 p.m.  (Trial Tr., June 16, 2017, at 176, 177).  At
this time, the Court noted its surprise at the Plaintiff's sudden decision to rest his case
"given our discussion before we broke for lunch, with respect to Mr. Strauss."  (*Id.* at 177).
Defendants' counsel explained that, had he known this was going to occur, he "would have
demanded that Mr. Strauss be at this courthouse and absolutely, positively ready to go on.
I wanted the gentleman live, so I would have demanded it, wholeheartedly."  (*Id.*).

The following Monday, Plaintiff's counsel objected to the playing of Mr. Strauss'
video deposition.  In explaining his reasoning, and ignoring the fact that his co-counsel had
previously represented to the Court that they were in the "middle" of their case, Plaintiff's
counsel complained:

> During the course of the afternoon on Monday [*sic*],[28] it was revealed, of
> course, Your Honor, that the Defense did, in fact, have Mr. Strauss under
> their control, and he was otherwise no longer unavailable, at which point in
> time, they could have called him at the conclusion of the Plaintiff's case,
> which ended somewhere around 1:00 or 1:30 in the afternoon. It's my

---

[28] In light of the aforementioned sequence of events at trial, and the content of the rest of Plaintiff's
counsel's statement, it appears that counsel misspoke when referencing "Monday" and instead intended to
say "Friday."

understanding that, Judge, at some point during that day, they released Mr. Strauss from his subpoena, and he is now gone to drive his tractor-trailer.

(Trial Tr., June 19, 2017, at 93-94). In fact, Defendants' counsel had requested that they be allowed to call Strauss at approximately 1:00 or 1:30 on Friday afternoon, to which Plaintiff objected, and Defendants only released Strauss from the subpoena that Friday afternoon after Plaintiff's counsel made clear that they would not be finished with their case-in-chief on Friday prior to the end of the trial that day or possibly even by the following Monday.

Plaintiff now complains that the Court should not have allowed Strauss' video deposition and that this error "was not harmless because it deprived the Plaintiff of his opportunity to cross-examine Mr. Strauss." (Doc. 360, at 36).[29]

---

[29] Both at trial and in his post-trial motion, Plaintiff attempts to argue that the Court erred in allowing Strauss' deposition testimony because the deposition was taken during discovery and not for purposes of trial. Plaintiff has offered no case law or federal rule to support this assertion. Rather,

> The federal courts have not drawn a distinction between discovery depositions and trial depositions for many years. *See, e.g., United States v. IBM,* 90 F.R.D. 377, 387 (S.D.N.Y. 1981)("Rule 32 does not 'evince a distinction as to the admissibility at trial between a deposition taken solely for purposes of discovery and one taken for use at trial....'")(quoting *Rosenthal v. Peoples Cab Co.,* 26 F.R.D. 116, 117 (W.D.Pa.1960)). Accordingly, any deposition taken by a party may be used at trial if the deponent subsequently becomes unavailable through no fault of the party proffering the testimony. *See* Fed.R.Civ.P. 32(a)(3).

*Donk v. Miller,* 2000 WL 218400, at *4 (S.D.N.Y. 2000). *See also, Vandenbraak v. Alfieri,* 2005 WL 1242158, at *5 (D. Del. 2005):

> Rule 32 makes no distinction between "discovery depositions" and "trial depositions." The defendants were present at the deposition of their expert and were at liberty to ask any questions necessary to correct the record or make sure that his opinions were not otherwise inaccurately reflected. There was apparently no agreement between counsel that any procedural or evidentiary rules would be waived. Thus, if the defendants chose not to ask questions, they must live with that choice. They cannot now be heard to complain about living with the record they had a hand in creating.

*Vandenbraak,* 2005 WL 1242158, at *5.

Preliminarily, and of utmost importance, Plaintiff was *not* deprived of his opportunity to cross-examine Strauss. Plaintiff's counsel had every opportunity to cross-examine Strauss during his deposition.  Plaintiff's counsel was present at the deposition, was in possession of Strauss' recorded statement which was marked as Exhibit 1 in Strauss' deposition (*see* Dep. of Strauss, at 18), and did, in fact, cross-examine Strauss on a number of issues.  The fact that counsel did not ask questions which he now speculates may have aided his case, and which he somehow believes deprived him of his right to cross-examine a witness, is of no moment.  As a sister court explained in a more extreme case where the defendants chose to ask *no* questions, "if the defendants chose not to ask questions, [despite being present at the deposition and being at liberty to ask questions,] they must live with that choice. They cannot now be heard to complain about living with the record they had a hand in creating." *Vandenbraak v. Alfieri*, 2005 WL 1242158, at *5 (D. Del. 2005).

The Court next turns to the Courtroom events, described above, which led to Plaintiff's current issue.  In what can only be considered an underhanded and devious trial tactic, Plaintiff's counsel both refused to allow Defendants' counsel to take Strauss out-of-turn, represented that they were still in the "middle" of their case, and then rested one hour later, almost immediately after Strauss was released from his subpoena as had been allowed by the Court and left the Courthouse to begin his scheduled over-the-road work trip. Had Plaintiff's counsel been forthcoming and indicated to the Court and defense counsel that there was even the possibility that Plaintiff would rest that day, the issue would have

been moot and Strauss would have been available to testify.  Since Plaintiff's counsel did, in fact, rest on Friday afternoon, Strauss could still have testified as part of the defendants' case and not been taken out-of-turn.  Counsel's current protestation that Plaintiff was prejudiced in some fashion is entirely due to their own purposeful deceit, and is merely the result of counsel's failed attempt at gamesmanship and refusing to act in a professional manner, or honestly communicate with the Court and opposing counsel.

Furthermore, Federal Rule of Civil Procedure 45 requires that a "party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  Here, Defendants' counsel properly determined that, although Strauss was under subpoena, requiring Strauss to remain within driving distance of the Courthouse until Plaintiff rested his case, a day which was unknown but appeared to be at least Monday or Tuesday of the following week, and therefore be unable to engage in his occupation which required him to take a multi-week over-the-road trip, imposed both an undue burden on Strauss as well as causing him to lose an assigned job from work, and thus, money to support himself and his family. By mid-day Friday, it was proper for Defendants' counsel to take the "reasonable steps" necessary to prevent Strauss from suffering undue burden or expense.  Plaintiff's counsel, apparently unconcerned about Strauss suffering adverse consequences due to being forced to remain locally for an indeterminate amount of time, engaged in deliberate and extremely unreasonable behavior in not allowing Strauss to

testify out-of-turn.  This is particularly true where Plaintiff was aware, but did not disclose, that he only intended to call one more witness, a person who was admitted as an expert in the calculation of economic loss, a subject unrelated to the actual events of May 10, 2011, and alternatively, knew that he would most likely be finished prior to the end of trial that day, thereby allowing Defendants to call Strauss as their first witness.  Rule 45 mandates that the Court "*must* enforce" the duty of the party or attorney responsible for the subpoena to take the aforementioned reasonable steps. Plaintiff, having purposely not provided the Court with accurate information, caused this Court to believe that the most reasonable steps to avoid undue burden and expense on Strauss was to release him from the subpoena and allow Defendants to show Strauss' videotaped deposition.[30]

---

[30] Other Federal Rules which may justify the Court's decision to allow Defendants to show Strauss' video deposition include Federal Rule of Civil Procedure 32 and Federal Rule of Evidence 611.

Pursuant to Federal Rule of Civil Procedure 32:

A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds:
   (A) that the witness is dead;
   (B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition;
   (C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;
   (D) that the party offering the deposition could not procure the witness's attendance by subpoena; or
   (E) on motion and notice, that exceptional circumstances make it desirable--in the interest of justice and with due regard to the importance of live testimony in open court--to permit the deposition to be used.

Fed. R. Civ. P. 32(a)(4).  Here, both parties focus on the applicability of this Rule, and specifically subsection (E).  Defendants argue that "there were 'exceptional circumstances' to warrant the use of Mr.

Alternatively, the Court's ruling can also be said to derive from the Court's "inherent authority to impose sanctions upon those who would abuse the judicial process." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1994). "Such salutary powers, the [Supreme] Court [has] noted, are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (internal quotation marks omitted).

> A primary aspect of [a district court's] discretion is the ability to fashion an *appropriate* sanction for conduct which abuses the judicial process. Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its

---

Strauss' videotape deposition, none of which were caused by the Defendants or their attorneys." (Doc. 367, at 30).

Further, although neither party raises it, Federal Rule of Evidence 611 may also provide a basis for the Court's decision. Pursuant to Rule 611,

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
> **(1)** make those procedures effective for determining the truth;
> **(2)** avoid wasting time; and
> **(3)** protect witnesses from harassment or undue embarrassment.

Fed. R. Evid. 611(a).

Both Rule 32 and Rule 611 allow a district court significant discretion in controlling the events at trial and support this Court's decision to permit Strauss' deposition to be shown to the jury. *See e.g.,* Rule 611 Advisory Committee Notes ("Item (1) restates in broad terms the power and obligation of the judge as developed under common law principles. It covers such concerns as whether testimony shall be in the form of a free narrative or responses to specific questions, . . . the order of calling witnesses and presenting evidence, . . . the use of demonstrative evidence, . . . and the many other questions arising during the course of a trial which can be solved only by the judge's common sense and fairness in view of the particular circumstances."); *see also, e.g., McDowell v. Blankenship*, 759 F.3d 847, 851 (8th Cir. 2014) (citing *Allgeier v. United States,* 909 F.2d 869, 876 (6th Cir.1990); *Garcia-Martinez v. City & Cty. of Denver,* 392 F.3d 1187, 1191-1192 (10th Cir. 2004))(The phrase "exceptional circumstances" in Rule 32 "unquestionably grants the district court considerable discretion in determining whether to admit deposition testimony.").

discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the conduct warrants sanction. If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney. Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object. Furthermore, there may be mitigating factors that must be accounted for in shaping the court's response.

Second, having evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate. Although the court need not exhaust all other sanctioning mechanisms prior to resorting to its inherent, the court must explain why it has chosen any particular sanction from the range of alternatives it has identified.

*Id.* at 74 (internal citations and quotation marks omitted).

In applying the Third Circuit's direction, this Court has already considered the conduct at issue and explained in detail, *supra*, why the conduct warrants sanction. In sum, but-for Plaintiff's counsel's conduct, this issue would not have arisen. There is no excuse for an experienced litigator to engage in bad faith practices, both with opposing counsel and the Court, and lie in an attempt to deceive the Court (*see e.g.,* "We're not putting [Strauss] on the stand in the middle of our case" (Trial Tr., June 16, 2017, at 132)). Further, Plaintiff's counsel's intentional wrongdoing prejudiced Defendants' ability to present their case while abiding by their duty to not cause undue hardship on a witness under subpoena. Although "through good fortune or diligence of court or counsel," Plaintiff arguably "fail[ed] to achieve

[his] untoward object", the Court agrees with Defendants that Strauss' live testimony would have been more beneficial to Defendants than the videotaped deposition.

Having considered the range of permissible sanctions, including assessing costs against Plaintiff's counsel for any lost wages Strauss may have suffered as a result of Plaintiff's inflexible approach and dishonest representations to the Court, or the costs in having to adjourn Court early and arrange for a new videotaped deposition to be taken that same day,[31] to the extent that allowing Defendants to present Strauss by videotaped deposition as opposed to in-person may be considered a sanction, such sanction appeared to be the most reasonable, time-efficient, and least costly option as well as one that would prevent Strauss from suffering any further hardship or undue expense. Such a sanction was not punitive in nature, but rather for the purpose of advancing the trial at a reasonable pace and accommodating Strauss, while imposing the least amount of prejudice on the parties as possible.

Here, Plaintiff's counsel's deliberately deceitful representations operated to provide this Court with false information, which led to this Court's decision to allow Defendants to call

---

[31] Although Plaintiff's counsel in passing at lunch time on Friday stated that they could again take Strauss' videotaped deposition that day if the Court would recess immediately, this suggestion was impracticable and appeared disingenuous. Preliminarily, an immediate recess would have ended the trial on Friday at approximately 12:30 p.m., thereby further prolonging the length of the trial the following week. Further, despite counsel's offer, Plaintiff's lead counsel had repeatedly that same day, and earlier in the week, requested that the Court adjourn at 3:00 p.m. so that he could attend his son's graduation. Although the Court granted this request, it is apparent that Plaintiff's counsel would not have had time to depose Strauss prior to attending the graduation. Defendants' lead counsel had previously informed the Court and opposing counsel that he was unavailable that weekend due to a long planned family reunion in Texas. The Court, being aware of the conflicting schedules of counsel for Plaintiff and Defendants, could not reasonably believe that Strauss could have been deposed prior to the following Monday.

Strauss by deposition, and then, once Plaintiff's deception had been fully realized, deny

Plaintiff's counsel's renewed objection on the following Monday. In light of the information

provided by Plaintiff, that he was in the "middle" of his case and would not allow Defendants

to call Strauss out-of-order, and Defendants' representation that Strauss had remained

available all week and needed to embark on a multi-week work trip, the Court made the

fairest decision it could. In executing its duties, the Court exercised its inherent power to

control the trial proceedings, including ensuring that the trial moved forward in a timely

fashion, while further being cautious of balancing the parties' interests, and not imposing a

significant hardship on a non-party witness. Had Plaintiff's counsel been honest in their

intentions, the Court would have instructed Defendants' counsel to have Strauss remain near

the Courthouse for the entirety of Friday, a solution which would have benefitted both parties.

### D. The Assured Clear Distance Rule

Plaintiff next argues that he is entitled to a new trial because the Court erred in

charging the jury on the "assured clear distance rule".

Plaintiff's brief asserts that the Court "erred in charging the jury on the assured clear

distance rule as such rule was inapplicable in the instant action and served only to confuse

and mislead the jury." (Doc. 360, at 36). Following this statement, Plaintiff recites a series

of citations and quotations to *Levey v. DeNardo*, 725 A.2d 733 (Pa. 1999). These citations

and quotations briefly set forth the law with respect to the assured clear distance rule but

primarily address the law of the sudden emergency doctrine. (*See* Doc. 360, at 36-37).

Rather than explain how this case law supports Plaintiff's position or is applicable to the current action, Plaintiff instead changes course, stating that "even if the charge on assured clear distance was not error, Plaintiff submits that it was error to charge twice on assured clear distance and only once on sudden emergency." (*Id.* at 37). Plaintiff thus fails to set forth *any* explanation as to how a charge on assured clear distance was error, instead devolving into some argument that the Court "overemphasi[zed]" the assured clear distance concept "[b]y charging twice on the assured clear distance rule and only once on the sudden emergency doctrine." (*Id.*). Because the Court is unaware of the basis for Plaintiff's assertion that the jury should not have been instructed on the assured clear distance rule, or why such rule was "inapplicable" and "confus[ing]" to the jury, the Court deems Plaintiff's argument on this basis as abandoned and waived.

The Court thus turns to Plaintiff's argument that the Court erred in purportedly instructing the jury twice on the assured clear distance rule, but only once on the sudden emergency doctrine.

Preliminarily, this argument has been waived by Plaintiff's counsel. After extensive discussion during the charge conference with respect to the assured clear distance rule and sudden emergency doctrine (*see* Trial Tr., June 21, 2017, at 9-14), the following exchange occurred between the Court, counsel for Plaintiff – Mr. Simon and Mr. Munley – and counsel for Defendants – Mr. Chamblee and Mr. Stewart:

> **MR. SIMON III**: You [the Court] cite Pennsylvania law, and the only thing you cite is assured clear distance ahead [on page 13 of the jury instructions].

**THE COURT**: That's right.

**MR. SIMON III**: Are you proposing, now, this whole section [of *Levey v. DeNardo*], in addition to that, so assured clear distance is referenced twice?

**THE COURT**: You will also have your statement on Page 10 that, under Pennsylvania law, the driver of a vehicle about to enter or cross a roadway from any other place, other than another roadway, shall yield a right-of-way to all vehicles.

So that's the section that I know, under cross examination, Mr. Munley cross-examined the expert witness, and of course, The Assured Clear Distance Rule was the section that he was asked about on direct examination. So I'm proposing that both of those would stay in, and in addition to that, in addition to that, I would add this language.

**MR. SIMON III**: We would agree, Your Honor.

**THE COURT**: All right. Would you agree?

**MR. CHAMBLEE**: Yes.

**THE COURT**: So we're clear, so we don't have a problem later, I would put that -- unless there's an objection -- because, again, I'm trying to work with the two of you here, or four of you, obviously. I would put that following the -- as a separate passage, if you will, I would put that, basically, after the quote on Page 13 that you've just made reference to.

**MR. SIMON III**: Well, Judge, I would object at the placement of that only because I think that we're talking about some affirmative defenses, and it's not Defendant's affirmative defenses where we charge.

**THE COURT**: Where would you like to put it?

**MR. SIMON III**: Someplace under general negligence, Judge.

**THE COURT**: All right, what can the two of you agree to?

**MR. CHAMBLEE**: It seems to me that this -- not seems to me -- this addition you're making is to try to take both Plaintiff's position and our position and our

various statutory allegations and make sure the jury understands what's in play. So I don't care where, just as long as it goes after the Page 13 Assured Clear Distance instruction. To put it before doesn't make any sense.

**MR. MUNLEY**: I agree with that.

**MR. CHAMBLEE**: They agree.

**THE COURT**: All right, how about -- if you go to Page 14, right before the first full paragraph, "If you decide that both the Plaintiff and Defendants were negligent and negligence of these parties was a factual cause" -- do you see that?

**MR. CHAMBLEE**: Yes, Your Honor.

**MR. SIMON III**: Yes.

**THE COURT**: How about if we put it right before that?

**MR. CHAMBLEE**: Fine with me.

**MR. SIMON III**: Fine with us, Judge.

(Trial Tr., June 21, 2017, at 14-16).

The above exchange demonstrates that Plaintiff's counsel not only agreed with the placement of the charge within the instructions, but also specifically noted that the assured clear distance rule would be referenced twice, and following the Court's explanation as to why, responded that "We would agree, Your Honor." Plaintiff, having agreed to the Court's proposed amendment to the jury instructions and fully understanding what would be included within those instructions, cannot now claim that the assured clear distance instruction was given twice and thus was in error. *See e.g., Abromson v. Am. Pacific Corp.,* 114 F.3d 898, 903-904 (9th Cir. 1997) (finding that Plaintiff waived any objection to the

Court's failure to give her requested jury instruction where, "[w]hen the district court indicated that the proposed instruction was argumentative and proposed a different one that covered the matter, she did not object, [and i]nstead, [Plaintiff] acquiesced in the court's substitute instruction. The court said, 'Take a look at this one,' and her attorney said, 'That's acceptable from our perspective, your honor.'").

Even if the objection had not been waived, Plaintiff's argument still fails for several reasons.

First, the Court notes that the assured clear distance rule and sudden emergency doctrine were both addressed by this Court when instructing the jury on the Defendants' affirmative defense that *Plaintiff's own negligence* was a factual cause of his injury. Neither rule or doctrine was mentioned when instructing the jury on the applicable law when determining whether Green was negligent. Here, the jury did not reach the question of Plaintiff's negligence, instead finding on Question 1 of the Special Verdict form that Plaintiff failed to establish by a preponderance of the evidence that Green was negligent. In addition, the issue of whether Botey was negligent for failing to adhere to the assured clear distance rule did not preclude a finding by the jury that Green was also negligent.

Next, the Court is not convinced that the jury was, in fact, instructed twice on the assured clear distance rule. Rather, the Court first instructed the jury by providing the statutory language 75 Pa.C.S.A. § 3361, which states that under Pennsylvania law:

> No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential

> hazards then existing, nor at a speed greater than will permit the driver to bring his vehicle to a stop within the assured clear distance ahead.

(*See* Jury Charge, Doc. 333, at 13). After explaining that "Defendants claim that Mr. Botey violated this law" and reminding the jury about the necessary analysis when determining negligence and negligence *per se*, the Court in the next paragraph explained to the jury what the assured clear distance rule and sudden emergency doctrine meant. (*Id.* at 14). Thus, the Court's explanation of the assured clear distance rule was merely a continuation of, and elaboration on, its quotation of the statutory language underlying the rule.

In addition, a Court has broad discretion in formulating its jury instructions and "[a] party has no vested interest in any particular form of instructions; the language of the charge is for the trial court to determine." *James v. Continental Ins. Co.*, 424 F.2d 1064, 1065 (3d Cir. 1970). *See also*, *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1124 (3d Cir. 1992) ("a trial judge has broad discretion concerning the particular language used in a jury instruction.").

As the Third Circuit has explained:

> When we assess jury instructions we must look at the totality of the charge given to the jury, not merely a particular paragraph or sentence. *See In re Braen*, 900 F.2d 621, 626 (3d Cir.1990) (citing *United States v. Piccolo*, 835 F.2d 517, 520 (3d Cir.1987)). "We review jury instructions to determine whether, if taken as a whole, they properly apprised the jury of the issues and the applicable law." *Tigg Corp. v. Dow Corning, Corp.*, 962 F.2d 1119, 1123 (3d Cir.1992) (citing *Gutzan v. Altair Airlines, Inc.*, 766 F.2d 135, 138 (3d Cir.1985)). "'The trial court should be reversed only if the instruction was capable of confusing and thereby misleading the jury.'" *United States v. Rockwell*, 781 F.2d 985, 991 (3d Cir.1986) (quoting *United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir.1984)).

*Dressler v. Busch Entm't Corp.*, 143 F.3d 778, 780 (3d Cir. 1998). Otherwise stated, the

"'charge, taken as a whole and viewed in light of the evidence, [must] fairly and adequately

submit[ ] the issues in the case to the jury.'" *Tigg*, 962 F.2d at 1123 (quoting *Link v.*

*Mercedes-Benz of N. Am.*, 788 F.2d 918, 920 (3d Cir. 1986)) (alterations in original).

Even if the Court were to accept Plaintiff's proposition that the jury was instructed

twice on the assured clear distance rule, and that this instruction twice was error, Plaintiff

fails to present any argument as to why this error was not harmless. Instead, Plaintiff only

conclusorily reasons that it was "not harmless error in light of the fact that the Jury returned

a verdict finding Defendant Green not negligent." (Doc. 360, at 38). Such a broad

unsupported statement by a losing party could be made with respect to any asserted error.

The mere fact that a party lost at trial does not, in and of itself, render every error harmful.

As a result, Plaintiff has not demonstrated in any concrete manner that the jury instructions

in some way misled or confused the jury or resulted in any prejudice to Botey.

Finally, here, Plaintiff does not assert that the jury instructions, in any way, misstated

the applicable law, or that the jury was not apprised of all relevant issues. Instead, Plaintiff

focuses on an assertion that the assured clear distance rule was charged on twice,

somehow inexplicably causing Plaintiff to suffer harm. When looking at the instructions as a

whole, Plaintiff has failed to show how this Court's instructions may have been capable of

misleading or confusing the jury or of causing prejudice to Plaintiff.

For the aforementioned reasons, the Court will deny Plaintiff's request for a new trial on the basis that the Court erred in charging the jury on the assured clear distance rule.

### E. Evidence that Green was "Off Route" in the Days Prior to the Accident

On June 8, 2017, this Court granted Defendants' Motion in Limine to Preclude any Inference, Evidence or Testimony that Defendant, Robert D. Green, was "Off Route" in any of the Days Leading up to the Accident (Doc. 172). (Docs. 294, 295). Plaintiff now seeks a new trial on the basis that the Court erred in precluding evidence that Green was "off route" in the days prior to the accident at issue.

Under the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is not admissible and relevant evidence is admissible unless otherwise provided by the Constitution, federal statute, Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Even if the Court deems the relevant evidence to be admissible, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.

Plaintiff asserts that "[e]vidence that the Defendant [Green] was off route or getting lost while driving was relevant to the Defendants' [*sic*] cognitive state at the time of the

subject collision", and thus relevant to Plaintiff's claims.  (Doc. 360, at 39).  In support of this position, Plaintiff cites to Defendants' expert, Dr. Schretlen, and states that Dr. Schretlen "testified at trial that 'getting lost while driving' is a sign of dementia".  (Doc. 360, at 39). This statement is an oversimplification of Dr. Schretlen's testimony and fails to demonstrate that evidence that Green was off route is not substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.

While answering a direct question by Plaintiff's counsel about whether *Plaintiff Botey* suffered a mild cognitive impairment in the accident, Dr. Schretlen volunteered a lengthy explanation on the progression of dementia, stating in part:

> What happens is your memory and your cognitive functioning declines over time. You don't get demented for quite awhile. Initially, you just have a few more memory mistakes, and then more and more. And then pretty soon you'll have the other problems, as well: Word finding difficulty, getting confused, *maybe* getting lost while driving. And eventually you cross a threshold where you get the diagnosis of dementia.

(Doc. 360-8, at 131-133) (emphasis added).  In providing this general list of problems associated with dementia, Dr. Schretlen's language is equivocal as to whether a person may get lost while driving, and does not offer any information as to when getting lost while driving may be a sign of dementia or at what stage of dementia this symptom may arise. Further, when specifically asked about Defendant Green, Dr. Schretlen did not know who Green was without prompting and admitted that he did not see any of Green's medical records.  (*Id.* at 133-134).  Dr. Schretlen also did not provide any testimony explaining how,

if at all, any of Green's actions, including his chosen route in the days prior to the accident, could be associated with dementia.

Despite Plaintiff's reliance on Dr. Schretlen's comment, Plaintiff has not pointed to any testimony or evidence which he presented, or could have presented, which would have linked the allegation that Green was "off route" in the days prior to the accident to any of Green's alleged cognitive impairments in May, 2011, or what significance, if any, that Green's being "off route" in the days prior to May 10, 2011, had on the accident, nor does it appear that any of Plaintiffs' experts mention or discuss Green being "off route" or what significance, if any, this had on the accident in their expert reports. Thus, allowing any evidence that Green was "off route" would have done no more than allow the jury to speculate, without any basis, as to whether Green's route prior to the accident may have been the result of dementia. The evidence of Green being "off route" would have been of little probative value and any value it may have had would have been substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.

The Court therefore finds that it did not err in precluding evidence that Green was "off route" on the days prior to the accident, for the same reason previously explained in the Court's Opinion granting Defendants' motion in limine, to wit, "any evidence, testimony, or inference that Green was 'off route' on any of the days prior to the accident is, at best, minimally relevant to the issues in this action, would force the jury to engage in pure speculation on a number of questions, and is barred by Rule 403. . . ." (*See* Doc. 294, at

10).[32]  Plaintiff's motion for a new trial on the basis that that the Court erred in precluding

evidence that Green was "off route" in the days prior to the accident will therefore be denied.

## F. Defendant Green's Medical Records

Plaintiff next asserts that he is entitled to a new trial because the Court erred "in

permitting Defendants' counsel to redact the medical records of Defendant Robert Green."

(Doc. 360, at 40).

The procedural history of this dispute is set forth in this Court's Order dated July 23,

2015 (Doc. 98):

> During a telephone conference with counsel for all parties on June 10, 2014, the Court ordered Defendants to produce any of Defendant Robert Green's dementia or neurologically-related medical records and identify with a privilege log any redactions, finding that medical records regarding loss of memory or confusion or other medical reports regarding loss of mental faculties were discoverable.
>
> On May 29, 2015, Plaintiff filed a Motion to Compel Unredacted Medical Records (Doc. 86). Plaintiff's motion argued that the medical records provided by Defendants were heavily redacted and that the accompanying discovery log was "very general" and "fail[ed] to identify by topic area what was redacted out, making it impossible to determine whether the Court Order was followed or whether there is information that would relate to or pertain to dementia, confusion or memory loss that was redacted. . . ." (Doc. 86, ¶¶ 13-15).  As a result, the Court held a conference call on June 9, 2015 to address the issues raised in Plaintiff's motion.  Unlike a typical privilege log where the information is withheld as attorney-client privileged or protected work-product, or under some other recognized privilege, in the instant case, the privilege log was designed to shield anything that was not dementia-related or related to

---

[32] Plaintiff also asserts that "evidence that Defendant Green was getting lost while driving is relevant to establish Defendant FFE's knowledge of Defendant Green's continuous pattern of unreasonable and unsafe driving habits", which is relevant to Plaintiff's corporate negligence claim.  (Doc. 360, at 39-40).  Because the jury did not reach the issue of FFE's negligence in this matter, this argument by Plaintiff is immaterial to the present motion.

the symptomatology of dementia, consistent with the Court's prior order allowing inquiry into those matters. Therefore, the Court ordered Defendants to provide a more detailed privilege log, identifying the general medical complaints and diagnoses of Green in each record and indicating what was redacted in such a manner that would allow the Court to interpret whether the omitted material had any relationship, no matter how attenuated, to the dementia issue.

Pursuant to the Court's order, Defendant Robert Green submitted a detailed privilege log on June 19, 2015 (Doc. 94). The Court, having reviewed the privilege log, has determined that the items which were withheld from disclosure on the basis that they bear no relationship to Defendant Green's dementia or any symptoms thereof were indeed properly withheld.

(Doc. 98). In a footnote, the Court noted:

During the conference call of June 9, 2015, the Court instructed Plaintiff's counsel that after receiving the new privilege log, should he believe that issues still remained with respect to the redacted documents, he should so inform the Court. Over one month has now passed since Plaintiff's receipt of Defendant Green's privilege log and Plaintiff's counsel has not filed anything contesting the adequacy of the privilege log.

(*Id.* at n. 1).

Plaintiff now asserts that "it was error to permit the Defendants counsel to determine what is or is not related or pertinent to confusion, memory loss, and dementia." (Doc. 360, at 42). Plaintiff further submits that "the withheld information reduced the accuracy and confidence of the evaluation of progressive dementia in a person", citing to the report of Dr. David Fields. (*Id.*).

First, as noted in the Court's July 23, 2015 Order, Plaintiff was provided an opportunity to object to, or raise issues with respect to, the new and more detailed privilege log, and declined to take any action. Plaintiff's attempt to now claim that he was deprived of

certain medical information, when the Court offered him an opportunity to renew his request for more information by "informing the Court" "should he believe that issues still remained with respect to the redacted documents", is disingenuous and ignores the fact that Plaintiff did not raise any dissatisfaction with the records and privilege log ultimately provided by Defendants, or request that the Court take any further action to ensure Plaintiff received all medical records to which he believes he was entitled, until the filing of this post-trial motion.

Further, Plaintiff's assertion that Dr. David Fields was unable to fully evaluate the progression of Green's dementia is of no consequence. Here, Dr. Fields did not testify at trial, nor was his report entered into evidence.[33] Instead, Dr. Fields was only briefly discussed at trial. During redirect examination by Plaintiff of his expert witness, Dr. Thomas Gill, counsel asked Dr. Gill to review Dr. Fields' report. Upon review, Dr. Gill characterized Dr. Fields' findings as follows:

> Dr. Fields felt that based on the records he reviewed, that Mr. Green had dementia, at the time of the crash, and his report is entirely consistent with my report and conclusions that appear in some areas to be almost carbon copies of one another.

(Trial Tr., June 14, 2017, at 194). The issue of what documents were available to Dr. Fields in the preparation of his report is irrelevant to the issues at trial, in particular where Dr. Fields' report was never shown to the jury and Plaintiff succeeded in allowing the jury to hear that Dr. Fields believed that Mr. Green had dementia at the time of the accident. Thus,

---

[33] Approximately three weeks before trial, Plaintiff's counsel suddenly informed the Court and opposing counsel that Dr. Fields was unavailable and unwilling to testify in this action (*see e.g.*, Doc. 265) and that counsel intended to replace Dr. Fields with a different expert, Dr. Gill.

there is no basis for Plaintiff's assertion that "the withheld information reduced the accuracy and confidence of the evaluation of progressive dementia in a person" as demonstrated by the report of Dr. Fields.

Although Plaintiff does not mention Dr. Gill, to the extent that Plaintiff is asserting that the accuracy of the analysis and opinion of Dr. Gill, Plaintiff's medical expert who replaced Dr. Fields immediately prior to trial, was reduced in some manner due to the redacted medical records, this argument is equally without merit. Dr. Gill, Plaintiff's own medical expert, testified without question that Green had dementia prior to, and at the time of, the accident, and further, was not capable of safely driving at the time the accident took place. Although unredacted medical records may or may not have supported Dr. Gill's opinion, the absence of the complete records did not prevent Dr. Gill from providing his medical opinion to a reasonable degree of medical certainty that Green suffered from mild to moderate dementia prior to, and at the time of, the accident, and was unsafe to drive. (*See e.g.,* Trial Tr., June 14, 2017, at 158-159). In addition, and significantly, it is undisputed that Green did not see a personal physician for several years prior to the accident, and thus, there were no pre-accident medical records available that may have demonstrated that cognitive difficulties were already present before May, 2011.

Finally, pursuant to Federal Rule of Civil Procedure 26,

[p]arties may obtain discovery regarding any *nonprivileged* matter that is *relevant* to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. . . .

Fed. R. Civ. P. 26(b)(1) (emphasis added). Here, at the time Plaintiff requested Green's medical records in 2015, after having already received a number of records and the privilege log, he failed to demonstrate to the Court the relevance of the additional information he was seeking, and his overbroad request for all of Green's medical records, without limitations, placed Green at substantial risk of suffering unnecessary embarrassment and harassment. Botey's broad request also risked infringing on Green's privileged relationship with his health care providers. Plaintiff did not, and still has not, shown how or why the redacted confidential information provided by Defendants was not sufficient to meet the proportional needs of the case in light of the surrounding facts, claims, and defenses.

Nonetheless, to the extent that there was any error in not providing Plaintiff with unredacted medical records during discovery, as previously stated, any error was harmless given that it was undisputed at trial that Green was diagnosed with dementia at some time following the accident, and Plaintiff's medical expert was able to provide unequivocal opinions with respect to when he believed Green began suffering from dementia and his belief that Green lacked the fitness to drive on the day of the accident. Therefore, Plaintiff has failed to demonstrate that he suffered any prejudice as a result of receiving redacted medical records or explain how unredacted medical records could have made any

difference, particularly in light of Dr. Gill's unequivocal opinions with respect to Green's dementia.

For the aforementioned reasons, the Court will deny Plaintiff's motion for a new trial on the basis that this Court erred in permitting Defendants' counsel to redact Green's medical records.

## G. Plaintiff's Request for a Spoliation of Evidence Adverse Inference Instruction

Lastly, Plaintiff contends that the Court erred in denying Plaintiff's request for a spoliation of evidence adverse inference instruction.

Plaintiff's assertion of error arises out of this Court's ruling with respect to Plaintiff's "Motion for Sanctions" (Doc. 74). As the Court explained in its Memorandum Opinion granting in part and denying in part Plaintiff's Motion, the procedural history of the motion is as follows:

> The parties originally planned to take Green's deposition during the normal discovery period. However, in February 2014, they learned that Green suffered from dementia and was therefore unable to be deposed. (*See* Oral Argument & Hearing Tr., Feb. 18, 2016, Doc. 120, at 20:8-22:5). Plaintiff then sought discovery from FFE of thirty days' worth of Green's trip documents and logs that FFE maintains for each of its truck drivers. (*See* Mot. to Compel Production of Docs., Doc. 61, at ¶ 3). He explained: "It is Plaintiff's position that Defendant Green was exhibiting signs of dementia prior to being allowed to drive the tractor trailer, and Plaintiff believes that 30-days worth of logs and trip documents would allow the Plaintiff to determine whether Defendant Green was having issues consistent with dementia." (*Id.* at ¶ 8). This would be relevant, Plaintiff argued, to establishing his claims against FFE and Conwell for negligence "in allowing Mr. Green to drive their vehicle when he lacked sufficient skill, judgment, and ability to safely do so." (*Id.* at ¶ 7). Defendants argued that Plaintiff was only entitled to logs going back 34 hours before the accident. (*See* Defs.' Reply Br. to Mot. to Compel, Doc. 64, at ¶ 3).

The Court heard argument by telephone on Plaintiff's Motion to Compel production of the thirty days of logs on January 6, 2015. After hearing arguments from both sides, the Court ordered Defendants to provide fifteen days of logs, as a reasonable compromise between the parties' positions. (*See* Teleconference Tr., Jan. 6, 2015, Doc. 115, at 10:4-20). The Court's Order provided that "Defendants shall produce logs, pre-trip inspections, and driver inspection vehicle reports for Defendant Robert D. Green for the 15 days prior to May 10, 2011, as well as the corresponding trip and operational documents and GPS records for those 15 days." (Order, Jan. 6, 2015, Doc. 70, at 1). As stated by the Plaintiff, "[t]he net effect of this ruling would be that the Plaintiff would get an additional eleven . . . days of logs and all corresponding documents regarding the movement of the Defendant's tractor-trailer." (Doc. 74 at ¶ 30).

Defendants only produced four additional days of logs, not the full fifteen that the Court ordered. (Doc. 120 at 11:22-12:9). Plaintiff then filed a Motion for Sanctions (Doc. 74), which requested "that an adverse inference jury instruction be read against Defendants at the time of trial" as well as "an Order precluding Defendants from arguing in dispositive motions that Plaintiff lacks evidence to prove his corporate negligence claims against Defendants FFE and Conwell based on the documents destroyed." (Doc. 74, at 12). The Court held an evidentiary hearing and oral argument on this Motion on February 18, 2016.

(Doc. 123, at 2-3).

This Court granted in part and denied in part Plaintiff's Motion, denying the motion insofar as it sought an adverse inference, but granting the motion insofar as not allowing the Defendants to prove the contents of the destroyed documents by other means or argue their contents in dispositive motions or at trial. (*See* Doc. 123, 124). Specifically, with respect to Plaintiff's request for an adverse inference, the Court explained:

Preliminarily, Plaintiff does not explain what "adverse inference" he wants. It is too great a leap to conclude that, if the destroyed records were preserved, they would have shown such evidence of a loss by Green of his mental

faculties that Defendants would have been placed on notice that he was suffering from dementia and was likely to cause accidents and therefore advance Plaintiff's negligence claims against FFE and Conwell. The Court will thus deny any request that it provide an instruction to the jury that the destroyed evidence would have been adverse to the Defendants as it would have shown evidence of Green suffering from dementia at the time of the accident, or more generally, that the jury should or could adopt the Plaintiff's interpretation of what the documents would have demonstrated. To the extent that this is not the adverse inference Plaintiff seeks, the Court will also deny any other adverse sanction inference at this time given that Plaintiff fails to clarify or narrow his request, and the Court is unable to determine what Plaintiff is seeking.

Even assuming that the destroyed records would in some way negatively reflect on Green's driving, Plaintiff does not contend that the missing records would show other accidents or safety violations. Rather, Plaintiff argues that the absence of these records is prejudicial to him because "we're not going to be able to show exactly what occurred on those trips, and that he was, in fact, getting lost, if he was, in fact, getting lost." (Doc. 120, at 96:7-16). It is unclear why or how Green's alleged tendency to get lost would put FFE on notice that Green was more likely to make dangerous turns into traffic. Plaintiff's counsel admitted that he was not "suggesting that the trucking company should have diagnosed Mr. Green with dementia." (Doc. 120, at 75:22-23; 98:25-99:3). However, while Plaintiff couches his need for the purged records in terms of helping to prove his negligence claim against the Defendants in that "they should have been watching him" and they "dropped the ball" and "negligently instructed him and didn't supervise him in a proper way when he was having" difficulties in training (see Doc. 120, at 99:3-100:7), Plaintiff's actual request for the missing records was an attempt to establish that Green was exhibiting signs of dementia at the time of the accident at issue. According to Plaintiff, he is "prejudiced in proving his negligence claims against Defendants as the documents encompassed by the Court's January 6, 2015 Order would show whether or not Defendant Green was having cognitive issues while driving and whether Defendants FFE and Conwell would have been aware of these issues." (Doc. 75, at 10-11). However, as Defendants point out, in May of 2011, Green had been "cleared by a medical doctor, in accordance with the Federal Motor Carrier's Safety Act, had a valid Med cert card and underwent that examination and was allowed to drive, in accordance with the regulations." (Doc. 120, at 22:24-23:3). Defendants state that they only received notice that Green was

suffering from dementia in February, 2014. (Doc. 120, at 20:8-16). Any argument that they allowed records to be destroyed in an attempt to hide evidence of cognitive deficiencies on Green's part is therefore entirely unconvincing.

(Doc. 123, at 11-13).

Here, just as with Plaintiff's Motion for Sanctions, Plaintiff's motion for a new trial on the basis that he was entitled to a spoliation of evidence adverse inference instruction again fails to explain what "adverse inference" Plaintiff believes he was entitled to (*see* Doc. 360, at 42-44). Plaintiff's current motion, while broadly asserting that the Court should have granted Plaintiff's request for a spoliation of evidence adverse inference instruction, merely states that "the destroyed documents may have shown whether or not Defendant Green was having cognitive issues while driving" and "may have shown whether Defendant Green continued his pattern of unsafe and reckless driving demonstrated throughout his training with Mr. Dodd and whether Defendants FFE and Conwell would have been aware of these issues." (*Id.* at 43-44). However, Plaintiff's brief does not address whether he was seeking, as the Court formulated, "an instruction to the jury that the destroyed evidence would have been adverse to the Defendants as it would have shown evidence of Green suffering from dementia at the time of the accident, or more generally, that the jury should or could adopt the Plaintiff's interpretation of what the documents would have demonstrated", or rather, a different adverse instruction, which the Court merely stated it was denying "*at this time*" given the Court's inability to determine what Plaintiff was seeking. To the extent Plaintiff was not seeking the specific adverse instruction set forth by the Court, Plaintiff was not

precluded from returning to the Court and making a more specific request as to the contours of a requested spoliation adverse inference instruction.

In addition, the adverse inference instruction Plaintiff sought would have application principally to Plaintiff's corporate negligence claim against FFE. The jury, having found that Green was not negligent, never reached the issue of FFE and Conwell's liability. Thus, the absence of an adverse instruction as to what the destroyed documents may have shown with respect to FFE and Conwell's knowledge is irrelevant to this post-trial motion. In addition, to the extent that Plaintiff is attempting to assert that the documents may have shown that Green was suffering from symptoms of dementia prior to the accident which should have placed FFE and Conwell on notice that Green had dementia, Plaintiff repeatedly admitted prior to, and during, trial that he was not asserting that FFE and Conwell should have known that Green suffered from dementia. (*See* Trial Tr., June 14, 2017, at 100 (Counsel for Plaintiff and Defendants confirming to the Court that "there [is] no dispute that FFE did not know of Mr. Green's dementia); *id.* at 102 (Counsel for Plaintiff informing the Court that "we will not be saying that FFE was at a standard where they had to diagnose Mr. Green with dementia"); Doc. 120, at 75; 98-99 (Plaintiff's counsel admitting at evidentiary hearing on Plaintiff's motion for sanctions that he was not "suggesting that the trucking company should have diagnosed Mr. Green with dementia."); *see also*, Trial Tr., June 14, 2017, at 156-157[34]).

---

[34] During Dr. Gill's direct examination, the following exchange occurred:

Plaintiff further contends that the Court "reverse[d] its Order in the middle of trial and offer[ed] the Defendants a curative instruction that there was no wrong doing", thus prejudicing the Plaintiff. (Doc. 360, at 44). This assertion is misleading, misrepresents the Court's rulings, and ignores the context of the Court's statements.

In support of his argument, Plaintiff quotes the Court's statement in its Memorandum Opinion addressing Plaintiff's motion for sanctions wherein the Court stated the following:

> Plaintiff is free to assert whatever record evidence he chooses which relates to the documented deficiencies on the part of Green in connection with his truck operating duties and his adherence, or lack thereof, to the applicable company rules.

(Doc. 360, at 49) (quoting Doc. 123, at 14). Plaintiff asserts that "[t]he Order further indicated that the Defendants would not be allowed to use any information to indicate there were no problems with its driver during that time." (*Id.*).

At trial, Defendants raised an objection to the videotaped deposition of Plaintiff's witness, Mark Rhea, FFE's Director of Driver Resources, wherein Plaintiff's counsel asked Mr. Dodd about whether certain drivers' logs were destroyed. (Trial Tr., June 13, 2017, at

---

Q. . . . When Mr. Dodd was seeing the signs that he saw, he was seeing the signs of an unsafe driver, but you're not saying that he should have been diagnosing him with dementia, that's up to the doctors, right?

A. That's right.

Q. Okay, and the same thing for the people at FFE?

A. That's right.

(Trial Tr., June 14, 2017, at 157) (*see also, id.* at 156).

8-15). After hearing arguments from counsel for all parties, the Court offered the following

suggestion:

> Well, perhaps, the solution here, gentlemen, is for me to instruct the jury that, in a prior pre-trial ruling, I've ruled there was no spoliation here, that there was no intentional destruction of records, and let this information come in. I think I can cure any potential prejudice by telling the jury how I've so ruled previously.

(*Id.* at 15). In response, Defendants' counsel stated that they did not believe that a curative

instruction was necessary. Despite Defendants' decision that they did not want the curative

instruction, Plaintiff's counsel then responded that Defendants' counsel "can have his

objection." (*Id.*).

The trial transcript thus clearly demonstrates that the Court was prepared to "let the

information come in" that Plaintiff was attempting to elicit through the testimony of Rhea.

Furthermore, in light of Defendants' decision to decline the curative instruction, were it not

for Plaintiff's sudden statement that they were no longer opposing Defendants' objection,

Plaintiff would have been permitted to present the evidence they now argue they were

somehow prevented from presenting, without the "curative instruction" they contend would

have prejudiced them.

Additionally, Plaintiff's assertion that the Court "reverse[d] its Order" is entirely

untrue. The Court's Memorandum Opinion addressing Plaintiff's motion for sanctions

specifically declined to find that the defendants intentionally destroyed any of the documents

requested by Plaintiff. (*See* Doc. 123, at 13-14)("[A]lthough the Defendants were at fault for

not preserving the requested documents, this appears to be mainly carelessness in *failing to preserve* documents from destruction in the ordinary course of business. There is no indication that such a failure even approached the level of intentionality.") (emphasis in original). Thus, the Court's suggestion that it offer an instruction that there was no intentional destruction of records is entirely consistent with its prior ruling.

Plaintiff's motion for a new trial on the basis that the Court erred in denying Plaintiff's request for an adverse inference instruction will thus be denied.

## V.   CONCLUSION

For the foregoing reasons, the Court will deny "Plaintiff's Motion for New Trial Pursuant to Federal Rule of Civil Procedure 59" (Doc. 340). A separate Order follows.

Robert D. Mariani
United States District Judge